*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0150p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,
          *Plaintiff-Appellant (07-5994)/Appellee,*

          *v.*

TOBIAS JONES,
          *Defendant-Appellee/Appellant (08-5771).*

Nos. 07-5994; 08-5771

───────────────

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 06-00168—Charles R. Simpson III, District Judge.

Argued:  September 15, 2008

Decided and Filed:  April 16, 2009

Before:  GUY, RYAN, and McKEAGUE, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Terry M. Cushing, ASSISTANT UNITED STATES ATTORNEY, Louisville, Kentucky, for Plaintiff.  Frank W. Heft, Jr., WESTERN KENTUCKY FEDERAL COMMUNITY DEFENDER, INC., Louisville, Kentucky, for Defendant.  **ON BRIEF:** Terry M. Cushing, Jo E. Lawless, Monica Wheatley, ASSISTANT UNITED STATES ATTORNEYS, Louisville, Kentucky, for Plaintiff.  Frank W. Heft, Jr., Laura R. Wyrosdick, WESTERN KENTUCKY FEDERAL COMMUNITY DEFENDER, INC., Louisville, Kentucky, for Defendant.

          McKEAGUE, J., delivered the opinion of the court, in which GUY, J., joined. RYAN, J. (p. 12), delivered a separate opinion concurring in the judgment.

───────────────

## OPINION

───────────────

          McKEAGUE, Circuit Judge.  Charged with being a felon in possession of a firearm, defendant Tobias Jones made a pretrial motion to suppress key evidence against him.  The district court granted the motion and the government now appeals.  Jones also appeals the

1

district court's denial of his motion to revoke its pretrial detention order.   For the reasons that follow, we conclude the district court erred in granting the motion to suppress and we therefore reverse that ruling.  We affirm the district court's decision to deny release pending appeal.

I

In the afternoon of November 29, 2006, Detective Jonathan Mattingly of the Louisville Metro Police Department was patrolling in his unmarked pickup truck in what was regarded as a drug-trafficking neighborhood in Louisville, near Seventh and Kentucky Streets.  He noticed a maroon Nissan automobile traveling northbound on Seventh Street and watched as it came to a stop in front of a house at 1245 South Seventh Street.  The car was occupied by a white female driver and two black male passengers.  Mattingly saw one of the passengers, later identified as defendant Tobias Jones, exit the Nissan and enter the house.  While Jones was in the house—his mother's house, as it turned out—the driver and the other passenger remained in the car with the engine running.  After a couple of minutes, Jones came out and returned to the waiting car.

Based on his seven years' experience in law enforcement and his observation of these events, Mattingly suspected he could be witnessing an incident of "flagging."[1] Intending to make inquiry of the Nissan's occupants, Mattingly had in the meantime radioed for assistance.  Before the Nissan could leave the curb, Mattingly pulled up in front of it, so that the front bumper of his pickup truck was about two or three feet from the Nissan's front bumper.  Almost simultaneously, Detective Kevin McKinney arrived and pulled his car, also unmarked, up to within four or five feet behind the Nissan.  As he pulled in behind the Nissan, McKinney turned on his emergency lights.

As the Nissan was thus hemmed in, Jones did not remain seated in the back seat of the Nissan.  Rather, he opened the car door and "jumped out."  It was at this point that

---

[1]In the suppression hearing, Mattingly testified that the residents of the neighborhood were predominantly African-American.  He described "flagging" as a common practice whereby a person unfamiliar with a neighborhood but interested in buying drugs drives around the neighborhood until flagged-down by someone waiting on a corner.  That person will then enter the vehicle, direct the driver to a house where drugs can be purchased, enter the house to negotiate the deal, and then return to the vehicle to consummate the transaction.  Mattingly described the actions of the Nissan's occupants as consistent with flagging, but admitted he had no other reason to suspect criminal activity was afoot.

Mattingly, having already noticed the confused, nervous, "like a deer in the headlights" look on Jones's face, also noticed a "lump" or "bulge" on Jones's person, "in the front," and saw him "acting weird . . . kind of holding his stomach." Thinking that Jones was about to run, Mattingly identified himself as a police officer and ordered him to stop. Jones immediately complied. Mattingly then patted Jones down and discovered a .38 caliber pistol in the front pocket of Jones's hooded sweatshirt. He removed the pistol and continued the pat down, finding a 9 mm pistol in the waistband of Jones's pants. It was later determined that the second gun was reported stolen in Indiana. Mattingly also found a bag of marijuana in Jones's right front pants pocket, and McKinney found a bag of marijuana in the passenger compartment of the Nissan. As Mattingly applied handcuffs to Jones, Jones asked him to go easy, because he had been shot in the chest a couple of weeks earlier. Indeed, later examination revealed a number of staples securing a wound on Jones's chest and abdomen.

Jones was arrested and eventually charged with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Before trial, Jones moved the district court to suppress the firearms the police seized during the stop and the statements he made during the incident. Jones contended the officers did not have reasonable suspicion when they initiated the stop, rendering the *Terry* stop and pat-down search unreasonable and violative of his Fourth Amendment rights. Following an evidentiary hearing, the district court agreed and granted the motion to suppress, but refused to release Jones from detention. Both parties appeal.

**II**

On appeal from an order granting a suppression motion, we review the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. McCauley*, 548 F.3d 440, 443 (6th Cir. 2008). Whether a seizure was reasonable under the Fourth Amendment is a question of law that must be reviewed *de novo*. *United States v. Pearce*, 531 F.3 374, 379 (6th Cir. 2008). A warrantless seizure is presumptively unreasonable, but "[t]he Supreme Court has identified three types of reasonable, and thus permissible, warrantless encounters between the police and citizens:

(1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked questions; (2) a temporary involuntary detention or *Terry* stop which must be predicated upon 'reasonable suspicion;' and (3) arrests which must be based upon 'probable cause.'" *Id.* at 380.

The manner in which officers Mattingly and McKinney originally approached the Nissan is not suggestive of a consensual encounter. In any event, a consensual encounter becomes a seizure when "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Circumstances indicative of a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* at 554. Here, by blocking in the Nissan, the officers had communicated to a reasonable person occupying the Nissan that he or she was not free to drive away. *See United States v. Baldwin*, 114 F. App'x 675, 678 (6th Cir. 2004) (concluding that seizure of occupants of parked park was effected when police vehicles pulled up in front of and behind vehicle, surrounding and blocking it). *See also Brendlin v. California*, 551 U.S. 249, 127 S. Ct. 2400, 2406-07 (2007) (holding that automobile passengers are seized during traffic stops even though the police command to stop is directed to the driver, because reasonable persons in the passenger seats would not feel free to move once the police have stopped the vehicle). Hence, *in this respect*, a warrantless "seizure" had occurred at the time the Nissan was hemmed in by the unmarked police vehicles.[2] We thus consider whether a brief investigatory *Terry* stop was justified by reasonable suspicion.

---

[2]While, at this point, the officers' conduct communicated to a reasonable occupant of the Nissan that he or she was not free to drive away, the record includes no grounds for finding that a reasonable occupant would have understood that his or her freedom of movement was being restrained by law enforcement officers. Both officers drove unmarked vehicles. While there is evidence that McKinney activated his emergency lights just as he pulled up behind the Nissan, it is likely that the occupants' attention had been drawn forward by Mattingly's prior sudden arrival in front of the Nissan. Indeed, McKinney believed that Jones was looking forward when he pulled in. In other words, at the instant when Jones "immediately" jumped out of the car, the occupants' reasonable apprehension that their freedom of movement was restrained was based ostensibly on the manifest physical obstruction of the Nissan, not on an unambiguous show of law enforcement authority.

In *Terry v. Ohio*, 392 U.S. 1, 30 (1968), the Supreme Court held that an officer may conduct a brief investigatory stop of a person without a warrant if the officer has reasonable articulable suspicion that criminal activity is afoot. *See Pearce*, 531 F.3d at 380. Whether a temporary investigative detention is justified by such reasonable suspicion requires consideration of the totality of the circumstances. *Id*. The officer must have a particularized and objective basis for suspecting wrongdoing, but the likelihood of criminal activity need not rise to the level of probable cause. *Id.* Absent reasonable suspicion, such a brief investigatory seizure is impermissible and any evidence derived from the seizure would be subject to suppression. *Id.* at 381. We evaluate whether reasonable suspicion existed at the point of seizure, not at the point of attempted seizure. *McCauley*, 548 F.3d at 443.

The district court concluded that, at the time the Nissan was initially blocked in, the officers' observations of conduct in a drug-trafficking neighborhood consistent with flagging but otherwise innocent did not give rise to reasonable suspicion. On reconsideration, the government urged the court to consider also Mattingly's observations of Jones's frightened, "jumping out of the car" reaction as part of the totality of the circumstances. The district court adhered to its original ruling, stating that Jones's reaction was reasonable, not suggestive of criminal activity. Although the question is a close one, we conclude the district court's ruling is marked by two errors.

**III**

In its initial decision, the district court erred by limiting its consideration to the circumstances known to the officers as of the time when they initiated the seizure by hemming in the Nissan. Yes, at that point, the Nissan was seized, and so were its occupants—but only insofar as they can be deemed to have submitted to the officers' show of authority. *Brendlin* makes it clear that, generally, when a police officer pulls over a vehicle during a traffic stop, the officer seizes everyone in the vehicle, not just the driver. 127 S.Ct. at 2406-07. Yet, the *Brendlin* Court also observed, "there is no seizure without actual submission." *Id*. at 2405. Without actual submission, "there is at most

an attempted seizure." *Id*. *See also California v. Hodari D.*, 499 U.S. 621, 626 (1991) (holding that a seizure is not effected through show of authority until the subject yields).

The *Brendlin* Court acknowledged that it may sometimes be hard to determine whether a subject has actually submitted in response to a show of authority. For instance, when an individual's submission "takes the form of passive acquiescence, there needs to be some test for telling when a seizure occurs in response to authority, and when it does not." *Brendlin*, 127 S.Ct. at 2405. The test the Court adopted asks whether, in view of all the circumstances, a reasonable person would have believed he was not free to terminate the encounter between the police and himself. *Id*. at 2405-06.

Applying this test to the facts of this case, we would have to conclude that the driver and other passenger in the Nissan were, by virtue of their passive acquiescence, effectively seized when the police vehicles hemmed in the Nissan. But what of Jones? Jones undisputedly did not passively acquiesce; he did not remain seated in the Nissan; he did not submit to the show of authority. Rather, he opened the car door and "jumped out" as though he wanted to run. It was at this point that Mattingly, having already noticed the confused, nervous, "like a deer in the headlights" look on Jones's face, also noticed a "lump" or a "bulge" on Jones's person, "in the front," and saw him "acting weird . . . kind of holding his stomach." Then Mattingly identified himself as a police officer and ordered Jones to stop. Jones immediately complied. It was *then* that Jones submitted to the show of authority. It was then that the seizure of Jones was effected. Up to that point, the officers' actions, in relation to Jones, amounted to no more than an attempted seizure.

*Brendlin* recognizes that even though an occupant in a vehicle stopped by the police is generally deemed seized by virtue of the stopping of the vehicle, he is not thereby seized if he does not submit to the show of authority:

> But what may amount to submission depends on what a person is doing
> before the show of authority: a fleeing man is not seized until he is
> physically overpowered, but one sitting in a chair may submit to
> authority by not getting up to run away. Here, Brendlin had no effective
> way to signal submission while the car was still moving on the roadway,

> but once it came to a stop he could, and apparently did, submit by staying inside.

*Id.* at 2409.  Unlike Brendlin, Jones did not submit by staying inside the Nissan after the officers arrived; he jumped out of the car and submitted only when Mattingly identified himself as a police officer and ordered him to stop.  Then, and only then, was Jones effectively seized.  Because Jones's initial response to the officers' arrival cannot be construed as submission to authority, there is no need to invoke the *Brendlin* reasonable person test to determine when the seizure occurred.  Irrespective of whether a reasonable person in Jones's situation would have felt free to leave,[3] he clearly did not yield and Jones's seizure was not effectuated until Jones complied with Mattingly's order to stop.

The instant facts are materially indistinguishable from those presented in *McCauley*, 548 F.3d at 441-42, where the court clearly held that the reasonable suspicion needed to support a *Terry* stop is measured as of the time of submission, not as of the time when the seizure was initiated or first attempted.  In *McCauley*, a police officer in a marked patrol car was pursuing a vehicle, an SUV, believed to be occupied by a felonious assault suspect.  He activated his overhead lights to pull the SUV over, but the driver ignored the officer.  The officer chased the SUV a short distance until it entered into a residential driveway and pulled into a garage, closing the garage door behind it.  The officer pulled in directly behind the SUV, obstructing the way of egress.  He observed a male passenger exit the SUV and ordered him to stop.  The suspect ignored the command and entered the house adjoining the garage yelling loudly.  Moments later, as the officer was speaking with the SUV's driver, the suspect exited the house, still yelling and cursing, and approached the officer.  When the officer pointed his weapon at the suspect, he finally submitted.  The court held that the suspect was not seized until he exited the house and submitted to the show of authority.  Irrespective of whether the officer had reasonable suspicion when he first attempted to stop the vehicle by activating

---

[3]Considering that Jones had suffered a gunshot wound to the chest a mere two to three weeks earlier, his reaction, in a drug-trafficking neighborhood, to the sudden arrival of two unmarked vehicles obstructing a vehicle he had just re-entered, may not have been unreasonable at all.  *See Brendlin*, 127 S.Ct. at 2408 (recognizing that ambiguity in the show of authority plays a role in evaluating the reasonable occupant's reaction).

his overhead lights, the court concluded, based on the totality of the circumstances known to the officer when the suspect finally submitted, that he had reasonable suspicion to seize the suspect at that point. *Id.* at 444-46.

*McCauley* represents a faithful application of *Brendlin*'s teaching. Applying the same analysis here, we find that Jones, like McCauley, a passenger in a vehicle that had been blocked in by the police, was not seized until he submitted to the officer's show of authority. Jones, like McCauley, did not passively acquiesce, but exited the vehicle, in apparent defiance of the show of authority. Only when Jones stopped, in response to Mattingly's command, like McCauley raising his hands in response to the officer's show of force, was Jones effectively seized. Accordingly, and consistent with the holding in *McCauley*, we hold that the district court, in measuring reasonable suspicion, should have considered all of Mattingly's observations up to the moment when Jones finally yielded to the unambiguous show of police authority.

To the extent, therefore, that the district court, in its initial ruling, limited its assessment of reasonable suspicion to the information available to the officers when the seizure was initiated, it erred.[4] To the extent that the district court expanded its view of the record on reconsideration of its original suppression order, and yet still found reasonable suspicion lacking, we hold, for the reasons that follow, that it erred in its assessment of the totality of the circumstances.

**IV**

In the suppression hearing, Mattingly testified that he had almost seven years' experience in law enforcement with the Louisville Metro Police Department, most of it devoted to drug-related crime investigations. Based on this experience, Mattingly recognized the indicia of flagging (i.e., drug trafficking) when he observed the Nissan and the conduct of its occupants, as he patrolled in a known drug-trafficking neighborhood. These observations, Mattingly believed, justified further inquiry. We

---

[4]In defense of the district court, we acknowledge that the clarity afforded by the Supreme Court in *Brendlin* was hardly available when the district court made its initial ruling, as *Brendlin* had been decided a mere two days earlier and was not cited to the court by either of the parties.

have recognized the importance of allowing police officers to draw reasonable inferences from their observations in light of their specialized training and experience. *See McCauley*, 548 F.3d at 445; *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006) ("While reasonable suspicion must be based on more than ill-defined hunches, officers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might elude an untrained person." (Internal quotation marks and citations omitted.)).

Indeed, the district court paid lip service to this consideration in its initial ruling, but deemed the indicia of flagging insufficient to establish reasonable suspicion where, in fact, flagging was not going on. Yet, the fact that the Nissan's occupants were not engaged in flagging does not negate the fact that their conduct was consistent with flagging. Nor does it undermine the reasonableness of Mattingly's deduction that flagging may have been afoot. Mattingly's observation and deduction, though perhaps not sufficient in themselves to establish reasonable suspicion, certainly represented a relevant part of the totality of the circumstances.

On reconsideration, the district court concluded that Jones's frightened reaction to the sudden arrival of the unmarked vehicles added little to the totality of the circumstances. The court treated Jones's frightened reaction dismissively, finding it was not an unexpected or unreasonable reaction and therefore not suspicious. Yet, circumstances comprising a particularized and objective basis for reasonable suspicion need not be uncommon or especially unique. *McCauley*, 548 F.3d at 444. Further, although each particular act in a series of acts may be innocent in itself, taken together, they may substantiate suspicion of wrongdoing warranting further investigation. *United States v. Marxen*, 410 F.3d 326, 329 (6th Cir. 2005). In this regard, the district court's analysis is tainted by an improper parsing of the information available to Mattingly. *See United States v. Orsolini*, 300 F.3d 724, 728 (6th Cir. 2002) (district court held to have erred by analyzing suspicious circumstances individually rather than in their totality).

Although the district court purported to consider the totality of the circumstances, it gave no weight to Mattingly's observations (1) of a bulge in the front of Jones's

hooded sweatshirt, (2) of Jones weirdly holding his stomach, and (3) of Jones appearing to want to run.   In our opinion, these are critical observations, suggesting  the possible presence of a firearm in a confrontational setting, and calling for an immediate show of authority to neutralize potential danger and conduct further investigation.  *See Pearce*, 531 F.3d at 382 (reasonable suspicion deemed established where officer observed suspect in high-crime area exiting a vehicle, glancing toward him, hunching over, placing his right hand in the small of his back and starting to back away); *McCauley*, 548 F.3d 444-46 (reasonable suspicion measured based on information known when seizure was initiated *and* information gathered while effectuating seizure).

The totality of relevant circumstances included the facts that:  Mattingly had substantial experience in law enforcement, much of it spent investigating drug-related crimes; he was patrolling in a known drug-trafficking area when he observed conduct undisputedly consistent with flagging; when Mattingly confronted the occupants of the Nissan, Jones reacted in a nervous and frightened manner, in apparent defiance; and that, as Jones jumped out of the car as though to run, he was seen to have a bulge in the front of his sweatshirt which he was holding in a weird way.  These circumstances, viewed together, not individually, comprise a particularized and objective basis for suspecting wrongdoing.

Accordingly, when Jones's seizure was effected, it was supported by reasonable suspicion.  It follows that Jones's Fourth Amendment rights were not violated and that the district court's suppression of the evidence seized was erroneous.   The suppression order must therefore be reversed.

## V

Jones has also appealed the district court's denial of his motion to revoke his detention order pending the government's appeal of the suppression order. The motion to revoke the pretrial detention order was based largely on issuance of the suppression order, the government's appeal of which postponed further trial proceedings.   By reversing the suppression order, we have thus removed the primary impetus for the motion to revoke detention order.  Moreover, on due consideration of the governing

factors, prescribed at 18 U.S.C. § 3142(g), we remain unpersuaded that the district court erred in deciding not to release Jones from detention pending appeal. Nor do we find, under the circumstances of this case, that Jones's continued detention resulted in a due process violation. Accordingly, the district court's denial of defendant's motion to revoke detention order will be affirmed.

## VI

For the foregoing reasons, the district court's suppression order is **REVERSED**, the district court's order denying revocation of detention order is **AFFIRMED**, and the case is **REMANDED** to the district court for further proceedings.

---

**CONCURRING IN THE JUDGMENT**

---

RYAN, Circuit Judge, concurring in the judgment.  I agree that *Brendlin v. California*, 551 U.S. 249 (2007), and *United States v. McCauley*, 548 F.3d 440 (6th Cir. 2008), *cert. denied*, No. 08-8555, 2009 WL 301857 (U.S. Mar. 9, 2009), require a second look at the question whether Jones was "seized" for Fourth Amendment purposes, as his fellow passengers undisputably were, despite stepping out of the car and standing next to it.  That will, in my judgment, require further fact finding by the trial court, particularly as to whether, in emerging from the car, Jones intended to indicate that he was not submitting to the authority of the police officers.

Therefore, I concur in the judgment to reverse and remand.