NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0471n.06

No. 12-1099

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*May 10, 2013*

DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

LEE ARTHUR LOGAN,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF MICHIGAN

BEFORE: COLE and GRIFFIN, Circuit Judges; and GWIN, District Judge.[*]

GRIFFIN, Circuit Judge, joined by COLE, Circuit Judge.

Defendant Lee Arthur Logan appeals his judgment of conviction and sentence for being a felon in possession of a firearm and ammunition, 18 U.S.C. §§ 922(g)(1) and 924(e), on the ground that the district court erred when it denied his motion to suppress certain evidence as fruits of an unlawful seizure under the Fourth Amendment. We hold that the officers had reasonable suspicion to initiate an investigatory stop at the point of Logan's seizure and, therefore, no Fourth Amendment violation occurred. Accordingly, we affirm.

I.

The events at issue in this case occurred on October 13, 2010, at approximately 10:30 p.m., on the north side of Kalamazoo, Michigan. Joseph Boutell, a public safety officer, was patrolling

---

[*]The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

the streets by himself when he noticed a white Chevrolet Suburban parked in a vacant lot around the 600 block of Mabel Street, an area with a high incidence of drug trafficking and violence. The vehicle's headlights were off, but its interior dome light was on, and Officer Boutell estimated that four or five individuals were inside. In this same area, Officer Boutell has found individuals smoking marijuana and consuming alcohol. Officer Boutell believed that the individuals in the vehicle were trespassing.

Given the number of occupants, Officer Boutell drove past the lot without stopping and contacted two other public safety officers, Brian Veltman and Derek Weldon. He requested their assistance investigating a suspicious vehicle and asked them to meet him at a nearby location. All three officers were under the impression that the city owned the parking lot in question. In reality, however, the area was comprised of three separate lots, only one of which the city owned, and, as it turned out, the white Suburban was parked on private property.

The officers decided to enclose on the vehicle together. To gain a tactical advantage, the officers pulled into the parking lot with their emergency lights off, so as to take the occupants by surprise. As they neared, the officers shined their spotlights on the vehicle, another tactical advantage, designed to temporarily blind the occupants of the vehicle and as a measure of officer safety. The officers parked their patrol cars at a considerable distance from the vehicle (twenty to forty feet) and in a fashion that did not block the vehicle's means of egress from the lot. Officer Boutell planned to approach the driver's side of the vehicle, while Officers Veltman and Weldon planned to approach the passenger's side.

A man and a woman were standing outside the driver's side of the vehicle. Just as the officers emerged from their patrol cars, a man later identified as defendant Lee Logan quickly exited the vehicle from the front side passenger door. Officer Weldon drew his gun and ordered Logan back into the vehicle. Logan hesitated, unsure about what he wanted to do, and he "stutter stepped" back and forth. Logan's behavior indicated to Officer Weldon that he was likely trying to distance himself from contraband in the car.

At that point, Officer Veltman waved at Logan and said "come over here with me." Officer Veltman testified that Logan appeared uncomfortable and did not want to be by the passenger's seat. Officer Veltman asked Logan for his name. Asked whether he was in possession of any contraband, Logan responded that he was not, and he gave Officer Veltman consent to search his person. After discovering a bullet in the right pocket of Logan's jacket, Office Veltman placed Logan in handcuffs. As Officer Veltman suspected, Logan had given him a false name. Eventually, Logan told Officer Veltman his true identity, and the database indicated that there was a warrant out for his arrest.

Meanwhile, Officer Boutell engaged the man on the driver's side of the vehicle, identified as Zachary Jones. Jones was "not fully cooperative." Officer Boutell repeatedly told him to keep his hands out of his pockets. In light of Jones's nervous behavior and as a safety measure, Officer Boutell patted him down for weapons. Officer Boutell did not find any weapons on Jones's person. He also saw what appeared to be an open bottle of alcohol in the vehicle's console. He retrieved the bottle of gin from the vehicle and placed it on the hood of his patrol car. At this point, Officer Boutell believed that he had the authority to lawfully search the entire vehicle. In doing so, Officer

Boutell found a loaded handgun under the front passenger's seat. The bullet found in Logan's pocket was a match.

Logan was charged in an indictment for being a felon in possession of a firearm and ammunition, 18 U.S.C. §§ 922(g)(1) and 924(e). Logan moved to suppress the bullet found on his person, the firearm found under the passenger's seat, and the warrant for his arrest as fruits of an unlawful seizure, in violation of his Fourth Amendment rights.

In its oral ruling from the bench, the district court first rejected the government's argument that the entire encounter was consensual; according to the court, when the three officers converged on the scene, a reasonable person would not have believed that he was free to leave or otherwise terminate the encounter. Next, with regard to the individuals on the driver's side of the vehicle, the court determined that they were seized at the outset by virtue of their acquiescence to the officers' demands. Logan, however, did not immediately submit to the officers' show of authority and, therefore, was not seized at the beginning of the encounter. Logan had been ordered to get back into the vehicle, he hesitated, he stutter stepped back and forth, indecisive about his next move, and finally he complied with Officer Veltman's request to "come over here with me." The district court concluded that, at that point, Logan was seized.

Regarding whether the seizure was supported by reasonable suspicion, the district court gave consideration (but not undue weight) to the fact that the 600 block of Mabel Street is in a high-crime area on the north side of Kalamazoo. It gave no weight to the dope house allegedly in close proximity to the site of the encounter because it had not been in the contemplation of the officers.

With regard to Officer Boutell's mistaken belief that the vehicle was trespassing on city-owned property, the district court found that the error was objectively reasonable given the close proximity of the vehicle to a city-owned lot and, moreover, the circumstances justified the stop even without the trespass. This is because the scene was in close proximity to a cut-through that was frequently used as a means of flight by people committing criminal acts in the adjoining neighborhood. According to the district court, the vehicle's close proximity to the cut-through, combined with Logan's actions prior to his seizure, provided reasonable and articulable suspicion to initiate an investigatory stop. Finally, the information acquired at the scene, including the discovery of the bullet in Logan's pocket during the consensual search of his person, provided probable cause to search the vehicle. Accordingly, the district court denied Logan's motion to suppress.

Logan entered a conditional guilty plea, reserving the opportunity to appeal the district court's denial of his motion to suppress. The district court sentenced Logan to 204 months of imprisonment and 5 years of supervised release. Logan timely appealed.

II.

This case requires us to determine at which point Logan was seized and whether, at that time, the officers had reasonable suspicion that he was engaging in criminal activity sufficient to justify an investigatory stop. We review the district court's legal conclusions de novo and its factual findings for clear error. *United States v. McCraney*, 674 F.3d 614, 616 (6th Cir. 2012). The district court's legal conclusion regarding the point at which a seizure occurred is reviewed "de novo based upon underlying factual findings that will be disturbed only if clearly erroneous." *United States v.*

*Buchanon*, 72 F.3d 1217, 1223 (6th Cir. 1995). Whether there was reasonable suspicion to initiate an investigatory stop at that time is a mixed question of law and fact, which we review de novo. *United States v. Lyons*, 687 F.3d 754, 762 (6th Cir. 2012). In doing so, this court considers the evidence "in the light most likely to support the district court's decision." *United States v. Marxen*, 410 F.3d 326, 328 (6th Cir. 2005) (internal quotation marks omitted).

"A 'seizure' occurs when police detain an individual under circumstances where a reasonable person would not feel free to leave." *United States v. Lopez-Medina*, 461 F.3d 724, 739 (6th Cir. 2006). "A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Brendlin v. California*, 551 U.S. 249, 254 (2007); *see also United States v. Johnson*, 620 F.3d 685, 690 (6th Cir. 2010) ("[A]n individual must actually yield to the show of authority to be seized within the meaning of the Fourth Amendment."). "[W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Brendlin*, 551 U.S. at 262.

In this case, although three patrol cars converging on the scene was certainly a show of authority on the part of the officers that could amount to a seizure, the district court properly determined that Logan was not seized from the outset of the encounter because he did not submit to the show of authority. Instead, Logan "quickly exit[ed] the passenger side front door and just jump[ed] out of the vehicle." As explained in *Brendlin*, "one sitting in a chair [or a vehicle in this

case] may submit to authority by not getting up to run away." *Id*. Logan did not remain seated, and his decision to abruptly jump out of the vehicle is a sign of resistance to the show of authority. Logan was therefore not seized at that time.

At which point thereafter the seizure took place depends on when Logan finally yielded. As described by Officer Veltman at the suppression hearing, Logan "initially got out and started walking towards the front of the vehicle," and when Officer Weldon ordered him to return to the vehicle, "he seemed unsure of what he wanted to do. He kind of stutter stepped toward the passenger's seat where he originally was, and he kind of stutter stepped away from it, and went back and forth for a little bit, and he just seemed a little uncomfortable." According to Officer Veltman, although he was being ordered to return to the vehicle, "[i]t looked to me like he . . . was very uncomfortable" and "didn't want to be by that passenger's seat where he was." It was as if he "wanted to distance himself from the vehicle." From Officer Veltman's perspective, the efforts to order Logan back to the vehicle "didn't seem to be going that well," which is why he asked Logan to "come over here and talk to me." According to Officer Weldon, Logan "was real hesitant to get back into the vehicle. It appeared to me he was trying to distance himself from the car." Based on the record, Officer Weldon told Logan in no uncertain terms to get back in the vehicle, yet Logan did not obey this command, nor did he freeze. Rather, he moved back and forth in hesitation. Viewing this evidence in the light most favorable to the district court's decision, Logan's behavior indicates at most that he was *contemplating* submission, which falls short of *actual* submission.

In *United States v. Jones*, 562 F.3d 768, 774 (6th Cir. 2009), involving facts similar to those presented here, this court concluded that the defendant was not seized when the police hemmed in because he did not remain seated in the vehicle but instead opened the door and jumped out as though he wanted to run. The defendant was only seized when he complied with the officer's order to stop. *Id*. at 774–75. Similarly, in *Robinson v. Howes*, 663 F.3d 819, 828 (6th Cir. 2011), we determined that the "[p]etitioner was not yet seized when he saw officers approaching his vehicle with their guns drawn because he did not submit to their show of authority; rather, he jumped out of his vehicle and began walking away." The petitioner was "unquestionably seized" when the officer "grabbed him." *Id*. Based on this authority and the record evidence in this case, we agree with the district court that actual submission occurred when Logan submitted to Officer Veltman's invitation to "come over here and talk to me."

In support of his position that the seizure occurred earlier, Logan relies on authority suggesting that "[p]hysical movement alone does not negate the possibility that a seizure may nevertheless have occurred." *United States v. Wilson*, 953 F.2d 116, 123 (4th Cir. 1991). We do not disagree with this general proposition, nor is it inconsistent with *Brendlin*. Although physical movement does not negate the possibility that a seizure occurred, neither does it conclusively establish that a seizure occurred. Rather, "what may amount to submission depends on what a person was doing before the show of authority." *Brendlin*, 551 U.S. at 262. In *Wilson*, "[t]he fact that [the defendant] continued walking through the airport [was] not dispositive," since, despite his best efforts, he was unable to terminate the encounter and continue on his way. *Wilson*, 953 F.2d

at 123.  A seizure had occurred because "[t]he officer's prolonged and persistent questioning *after* the [defendant] had conveyed an unequivocal unwillingness to engage in further conversation with the officer is the type of conduct that is proscribed by the Fourth Amendment."  *Id*. (emphasis added).   Implicit is that the defendant's "unequivocal unwillingness to engage in further conversation" at the outset did not amount to a seizure; the seizure occurred "sometime soon after" the defendant's resistive efforts, which were unsuccessful in the face of "[t]he officer's prolonged and persistent questioning."  *Id*.  The same can be said in this case.  Logan was seized sometime soon after his abrupt exit from the vehicle and hesitant stutter steps back and forth, when Officer Veltman pulled him aside.

Logan also points to *Kansas v. Smith*, 184 P.3d 890, 896–97 (Kan. 2008), in which the Supreme Court of Kansas affirmed the determination that the defendant passenger was seized when the police officer initiated a traffic stop, blocked the vehicle, and activated his patrol car's emergency lights.  The seizure occurred from the outset of the traffic stop, even though the defendant passenger exited the vehicle, walked to nearby steps, and sat down.  *Id*.  The court reasoned that "she did not walk away; she remained at or near the physical focal point of the investigation in a passive submission to the show of authority."  *Id*. at 896.

*Smith* is distinguishable from the instant case.  Logan's abrupt exit from the vehicle and hesitant stutter steps back and forth cannot be fairly analogized to casually walking to nearby steps and sitting down.  Moreover, the defendant passenger in *Smith* had not been ordered to return to the vehicle; she was therefore not directly disobeying police orders through her movement.  By contrast,

Logan continued his movement back and forth, apparently unsure about his next move, despite having been ordered to return to the vehicle. Thus, although Logan "remained at or near the physical focal point of the investigation," his behavior cannot be considered "passive submission to the show of authority," as in *Smith*.

Having concluded that Logan was seized when Officer Veltman pulled him aside, we next consider whether the seizure was lawful at that time. A police officer may initiate an investigatory stop short of probable cause to arrest. *United States v. Atchley*, 474 F.3d 840, 848 (6th Cir. 2007). A brief investigatory stop is justified under the Fourth Amendment where "a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *see also O'Malley v. City of Flint*, 652 F.3d 662, 670 (6th Cir. 2011) (explaining that a *Terry* stop must be supported by articulable facts that form a reasonable suspicion that the defendant was engaging in criminal activity). "The officer must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011) (internal quotation marks omitted). In evaluating whether the officers had a reasonable suspicion, this court examines the totality of the facts and circumstances of which the officers were aware, including the contextual factor of the area's crime level. *United States v. Davis*, 514 F.3d 596, 608 (6th Cir. 2008). "Additionally, the experience of the law enforcement officer must be taken into account in the reasonable suspicion analysis[.]" *United States v. McCauley*, 548 F.3d 440, 445 (6th Cir. 2008). The court may consider all events up until the point of seizure. *See Johnson*, 620 F.3d at 696.

In conducting its reasonable suspicion analysis, the district court first considered the fact that the 600 block of Mabel Street is a high-crime area of Kalamazoo, known for drug trafficking and gun violence. This consideration was appropriate. *See Davis*, 514 F.3d at 608; *cf. United States v. See*, 574 F.3d 309, 314 (6th Cir. 2009) (explaining that an individual's presence in a high-crime area is relevant and may be considered but cannot standing alone support a reasonable suspicion that the individual is engaging in criminal activity). It also considered that the vehicle was located in close proximity to a cut-through, frequently used as a means of flight by people committing criminal acts in the adjoining neighborhood. This fact was appropriately considered as either contextual evidence or the experience of the law enforcement officers. *See Davis*, 514 F.3d at 608; *McCauley*, 548 F.3d at 445. Most critically, the district court considered the information acquired by the officers during their approach of the vehicle up until the point of the seizure. This, too, was proper. *See Johnson*, 620 F.3d at 696. As the district court explained, based on the officers' experience and training, Logan's quick exit from the vehicle heightened the concern for their safety, particularly given the violent area. The officers' testimony reveals that Logan appeared indecisive about his next move and, for some reason, sought to distance himself from the passenger's seat of the vehicle. Although Logan did not run from the scene, it appeared that he started to flee by jumping out of the car, and he thereafter defied the commands of the police. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (recognizing "unprovoked flight upon noticing the police" as "a pertinent factor in determining reasonable suspicion"); *United States v. Jones*, 673 F.3d 497, 502 (6th Cir. 2012). Based on these circumstances weighed together, the court concluded that the officers had reasonable suspicion to

justify an investigatory stop and that the situation necessitated a timely exercise of authority to neutralize potential danger. Viewing the evidence in the light most favorable to that determination, no error occurred.

Logan emphasizes that an individual's presence in a high-crime area, in and of itself, does not establish reasonable suspicion. *See*, 574 F.3d at 314. He also points to "the dangers of relying too easily or too heavily" on this consideration, since "labeling an area 'high-crime' raises special concerns of racial, ethnic, and socioeconomic profiling." *United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir. 2006). Although these points are well taken, the district court did not rely solely on the fact that the vehicle was parked in a high-crime area to conclude that the officers had reasonable suspicion. Quite the opposite, the court indicated that it did not give the fact "undue weight" and noted that it was entitled only to "some consideration" in the totality of the circumstances.

Logan claims that this court in *Johnson* gave *no* weight to the high-crime area because "the area was known for drug trafficking specifically" and the officer "observed no contact from [the defendant] consistent with drug activity." *Johnson*, 620 F.3d at 693. His reading of *Johnson* is incorrect. Although our court cautioned about consideration of the area's crime level, we indicated that the factor may be considered in the totality of the circumstances but should not be given undue weight. *Id*. at 692–93.

Logan's reliance on *See* is similarly unavailing. Unlike in this case, the defendant in *See* was seized at the outset of the traffic stop. *See*, 574 F.3d at 313. At that point, the traffic stop was based almost entirely on context-based factors such as the time of day and the area's crime level, factors

which "would have pertained to anyone in the parking lot at that time." *Id.* at 314. Critically, the officer "did not suspect the men of a specific crime, he had not seen the men sitting in the car for an extended period of time, he was not acting on a tip, he had not seen the men do anything suspicious, and the men did not try to flee upon seeing [the officer] approach." *Id.* "Apart from the contextual factors of time and the high-crime status of the area, all that [the officer] knew at the time he parked his car was that there were three men in an unlit car in the parking lot of a housing complex and that they had not chosen to park in one of the spots closer to the building." *Id.* This did not amount to reasonable suspicion and, therefore, the stop was unlawful. *Id.*

In this case, however, the seizure occurred later, after the officers observed Logan jump from the vehicle and take hesitant stutter steps back and forth, appearing unsure about his next move, and, for some reason, trying to distance himself from the passenger's seat. Primarily based on these acquired observations, along with some consideration given to the high-crime area and nearby cut-through often used as an avenue of flight by individuals engaged in criminal activity, the officers at that point had an articulable, reasonable suspicion that Logan was engaged in criminal activity.

Logan points to authority suggesting that it is "a matter of common knowledge that men who are entirely innocent do sometimes fl[ee] from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses." *California v. Hodari D.*, 499 U.S. 621, 630 n.4 (1991) (Stevens, J., dissenting) (internal quotation marks omitted). This suggestion, valid as it may be, simply stands for the proposition that fleeing the scene is not always an accurate predictor of guilt. It does not stand for the proposition that fleeing the scene

cannot create reasonable suspicion of criminal activity. And while Logan may have had a right to avoid police contact, that right does not mean that flight and other uneasy or nervous behavior when approached can never weigh into an officer's calculus of reasonable suspicion. *See Caruthers*, 458 F.3d at 459 ("Although the police may validly consider an individual's furtiveness in deciding whether to conduct a *Terry* stop, courts must take care that the factor not be invoked cavalierly.").

Logan calls our attention to *United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011), where this court held that contextual factors and testimony that the defendant hurriedly walked away from the officer without making eye contact did not amount to reasonable suspicion. What Logan fails to mention is that, in *Beauchamp*, this court stated that avoiding police contact *can* contribute to reasonable suspicion where "specific facts have shown that the defendant's behavior was otherwise suspicious." *Id*. at 570–71. Here, Logan quickly exited the vehicle when the three patrol cars converged on the scene with their spotlights on. Despite that an officer had ordered him back into the vehicle and had drawn his gun, Logan took hesitant stutter steps back and forth and appeared to be trying to distance himself from the passenger's seat. This is not a situation where the defendant simply walked away and avoided eye contact in the face of a casual approach by the police.

Viewing the evidence in the light most favorable to the district court's decision, we hold that Logan was seized within the meaning of the Fourth Amendment when he submitted to Officer Veltman's invitation to "come over here and talk to me," and, at that point, the officers had reasonable suspicion to believe that Logan was engaged in criminal activity sufficient to justify a brief investigatory stop. We further hold that the information acquired during the *Terry* stop

provided probable cause to search the vehicle.  Accordingly, the bullet, firearm, and arrest warrant

were obtained lawfully, and the district court properly denied Logan's motion to suppress.

III.

For these reasons, we affirm.

GWIN, District Judge, joined by COLE, Circuit Judge, concurring.


While I join in the disposition of this case, I write separately to emphasize that I do so based on Logan's failure to comply with the officers' directives.

I do not believe that Logan's "shuffle step" contributed to reasonable suspicion. Indeed, I am not even sure what this term means. The "Texas Shuffle Step,"sometimes referred to as the "Texas Two Step," is a dance that "may be danced to any four-count music and may be danced in forward line of dance direction, sideward, or in place."[1] I doubt, however, that Logan was attempting dance steps.

I also do not agree with the majority's repeated references to "tactical advantages." Surely it would be a tactical advantage for police to execute all searches in the middle of the night without a warrant and without knocking. The Constitution, however, forbids such practices.

More importantly, video evidence reveals that when the officers came upon Logan, they ordered him back into the car at least six times. Logan did not get back in the car, and thus failed to submit to the officers' show of authority. Such a failure to submit supports reasonable suspicion. For this reason, I join in the disposition of this case.

I am nonetheless troubled by the overall events in this case. The police erroneously believed that Logan was trespassing. They converged on his car, foreclosing his escape. They ordered him back into the car. When Logan did not comply, they ordered him to come in their direction. He did.

---

[1]Betty Casey, *Dance Across Texas*, 106 (1985).

By not initially submitting, Logan's acts gave rise to reasonable suspicion, and, in turn, a lawful search. Perhaps the only way that Logan could have avoided being subject to a lawful search was to submit to an unlawful one. While I believe that this is the correct result in this case, it shows how cramped the freedoms afforded by the Fourth Amendment may become when officers make reasonable mistakes.