NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0589n.06

No. 18-3034

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Nov 27, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE |
| | ) | SOUTHERN DISTRICT OF |
| DAMITRES WARD | ) | OHIO |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: GIBBONS, SUTTON, and McKEAGUE, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** When the police asked Damitres Ward to come to them, he turned away, ran in the opposite direction, and threw a firearm into the air as he fled. Ward was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). In a pretrial motion to suppress, Ward claimed that the police obtained the firearm in violation of the Fourth Amendment. The district court denied the motion to suppress, holding that the officers had reasonable suspicion to seize Ward. Ward now appeals that denial. Whether the police violated Ward's Fourth Amendment rights turns on two issues: (1) whether the officers seized Ward before or when he ran from them and discarded the gun; and (2) if so, whether the officers had reasonable suspicion to do so. Because we find that Ward was not seized, we decline to reach the second issue. We therefore affirm the district court's denial of Ward's motion to suppress on alternative grounds.

I.

On November 9, 2016, Ward and his two friends, Marvin Hunter and Brian Harris, stood in front of Food City market in Dayton, Ohio. The market was located across the street from Desoto Bass housing complex, which Dayton police officers consider a high crime area. On this day, Dayton Police Officers Josh Campbell and Adam Sharp were patrolling the neighborhood. Over a period of seven hours, they passed by the market several times and noticed that on each occasion, the three men were standing outside the market and repeatedly entering and exiting a black SUV vehicle parked in front of the store. Believing this conduct to be consistent with drug trafficking, Campbell and Sharp decided to conduct a "field interview." The officers had not received any particular complaints about these three men.

The officers parked their cruiser parallel to the SUV and approached the men. Hunter and Harris stood closest to the officers, while Ward stood about five feet away, holding his dog on a leash. Around the same time that the interaction began, another officer, Mark Orick, arrived at the scene to assist. The officers began by asking the men whether they worked at the market and why they were "hanging out so long." Gov't Ex. 1, Video, 13:35:59–13:36:18. The men responded they were "just chillin.'" *Id.* The officers then asked whether the men had their IDs on them. Hunter said no, and the officers moved closer to ask follow-up questions. At the same time, Ward, still standing a few feet back and holding his dog, began reciting a string of numbers. The officers asked whether this was his Social Security number, and he said yes. He then repeated his Social Security number again and provided his name. The officers then said that "it's just odd that everyone hangs out here" and re-asked for Ward's and Hunter's Social Security numbers. *Id.* at 13:36:50–13:37:20. They repeated their numbers.

The officers then asked Hunter questions about the SUV. After learning that the SUV was Hunter's cousin's car, the officers asked Hunter and Ward whether they were involved in drug dealing. They both responded in the negative. Next, the officers moved closer to Hunter and whether they could perform a pat-down. Hunter said "but you got my ID," and Ward, still standing a few feet away with his dog, chimed in "but you got his Social, why are you doing that?" *Id.* at 13:37:52–13:38:02. The officers proceeded to pat down Hunter. Throughout the pat-down, Ward leaned against the SUV and gave his dog instructions to sit. He mostly looked at his dog and away from the officers.

Following Hunter's pat-down, Officer Sharp turned toward Ward and told him to "come on over here." *Id.* at 13:38:45–13:38:47. In response to Sharp's request, and before any officers physically touched him or attempted to block his path, Ward took off running in the opposite direction. Approximately three minutes passed between when the officers first approached the men and when Ward ran. Ward fled around the corner of Food City while Sharp and Campbell pursued him by foot. During the chase, Ward discarded a semi-automatic pistol, throwing it about five feet in the air above him.

In December 2016, Ward was indicted for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Before trial, Ward moved to suppress evidence of the gun, and a hearing on the suppression motion was held in March 2017. The district court denied Ward's motion. The district court found that although Ward was seized before he discarded the firearm, the seizure was constitutional under *Terry*. The court ruled that the officers had reasonable suspicion to believe the men were engaged in criminal activity based on the following factors:

(1) observing the suspects loitering in front of Food City for several hours;

(2) having received complaints from residents of the Desoto Bass Neighborhood about drug activity in and in front of Food City; and

(3) observing the suspects repeatedly entering and exiting the SUV, which was a common hallmark of drug trafficking activity that they had observed in this area.

DE 28, Order, Page ID 143–44 (quoting DE 25, Opp'n to Mot. To. Suppress, Page ID 127–28) (internal citations and alterations omitted). The district court also noted that it was reasonable for officers to suspect that the men might be carrying weapons because drug traffickers often carry weapons. The district court, therefore, found it reasonable to stop and frisk them.

Following the court's decision, Ward entered a conditional guilty plea in August 2017, reserving the right to appeal the suppression decision. In January 2018, the court sentenced Ward to 24 months of incarceration followed by three years of supervised release. Ward filed a notice of appeal the next day.

II.

In reviewing the denial of a motion to suppress, this court reviews the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Seymour*, 739 F.3d 923, 928 (6th Cir. 2014). "A factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Nichols*, 512 F.3d 789, 793 (6th Cir. 2008) (quoting *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999)), *overruled on other grounds as recognized in United States v. Buford*, 632 F.3d 264, 269 (6th Cir. 2011). When the district court denies a motion to suppress, the reviewing court "consider[s] the evidence in the light most favorable to the government." *United States v. Moon*, 513 F.3d 527,

4

536–37 (6th Cir. 2008) (quoting *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (en banc)).

A.

Ward challenges the district court's denial of his motion to suppress the firearm he abandoned while running from the officers. He contends that the district court erred in its determination that the officers had reasonable suspicion to seize him. Because we find that Ward had not yet been seized within the meaning of the Fourth Amendment when he ran from the officers and discarded the firearm, we need not reach the question of whether there was reasonable suspicion. Instead, we affirm the district court's denial of Ward's motion to suppress on the grounds that Ward was not seized under the Fourth Amendment. *See United States v. Pasquarille*, 20 F.3d 682, 685 (6th Cir. 1994) (noting that this court "need not rely on the grounds set forth by the district court. Rather, a denial of a motion to suppress will be affirmed on appeal if the district court's conclusion can be justified for any reason.").

1.

Viewing the evidence in the light most favorable to the government, we conclude that Ward was not seized within the meaning of the Fourth Amendment. The Fourth Amendment prohibits "unreasonable searches and seizures" by the government. U.S. Const. amend IV. Fourth Amendment protections extend to brief investigatory stops that fall short of traditional arrest. *See Terry v. Ohio*, 392 U.S. 1, 19 (1968); *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010). These facts implicate two lines of cases that guide our analysis. First, while a consensual encounter between the police and citizens does not implicate the Fourth Amendment, it may "become[] a seizure when 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Smith*, 594 F.3d at 536 (quoting *United States v.*

5

*Jones*, 562 F.3d 768, 772 (6th Cir. 2009)). The Supreme Court has noted "[e]xamples of circumstances that might indicate a seizure, even where the person did not attempt to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). These include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.*

Second, when a seizure occurs without the application of physical force, there must be a show of authority from the officers and the defendant must submit to the officers' show of authority. *California v. Hodari D.*, 499 U.S. 621, 626, 628 (1991) (noting that the reasonable person test is a "necessary, but not a sufficient," condition for finding seizure where no physical force is used). In analyzing when there is submission to authority, the Supreme Court has noted that "what may amount to submission depends on what a person was doing before the show of authority." *Brendlin v. California.* 551 U.S. 249, 262 (2007) ("[A] fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away."). "[O]therwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Smith*, 594 F.3d at 536 (quoting *Brendlin*, 551 U.S. at 254.) The Fourth Amendment, therefore, "does not apply to anything one may abandon while fleeing the police in an attempt to avoid a seizure." *United States v. Martin*, 399 F.3d 750, 752 (6th Cir. 2005) (citing *Hodari D.*, 499 U.S. at 629).

Thus, because the officers did not use any physical force to restrain Ward's liberty, the question is whether a reasonable person in Ward's shoes would have felt free to leave, and whether Ward actually submitted to the officers' show of authority. Because we find that Ward did not

submit to the officers' show of authority, it is unnecessary to analyze whether a reasonable person would have felt free to leave.

Ward's interactions with the officers, prior to fleeing and throwing the firearm, spanned a three minute time period and can be broken down into two main portions. First, there was a consensual encounter in which the officers engaged the men with questions, and the men provided answers and their Social Security numbers. Second, Ward watched the officers pat down Hunter. Neither occurrence amounts to a seizure of Ward under the Fourth Amendment.

2.

*Police Questioning*. When Sharp and Campbell arrived at the market, approached the men, asked them questions about what they were doing, and requested identification, there was no seizure. The Supreme Court has held that the Fourth Amendment is not implicated when officers merely ask suspects for identification or approach them in public spaces and ask questions in non-threatening ways. "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." *Terry*, 392 U.S. at 34 (White, J., concurring). "Police officers enjoy the liberty . . . to address questions to other persons, although ordinarily the person addressed has an equal right to ignore his interrogator and walk away." *Mendenhall*, 446 U.S. at 553 (quoting *Terry*, 392 U.S. at 32–33 (Harlan, J., concurring)) (internal citations and quotation marks omitted); *see INS v. Delgado*, 466 U.S. 210, 216 (1984) ("[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure."); *Florida v. Royer*, 460 U.S. 491, 497 (1983) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions

to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.").

Here, Sharp and Campbell approached the men while they stood on a public sidewalk outside of a market. The officers asked the men whether they had IDs on them, whether they were involved in drug dealing, and whether they owned the nearby SUV. After Ward provided his Social Security number and name, Sharp asked him to repeat his Social Security number again. Throughout this encounter, Ward stood a few feet behind Hunter and held his dog on a leash.

There was nothing in this two–minute interaction that elevated the encounter from a consensual police encounter to a seizure. Where the police ask questions of an individual, ask to examine the individual's identification, and do not otherwise threaten punishment for noncompliance, there is no seizure. *See Florida v. Bostick*, 501 U.S. 429 (1991). For example, the Supreme Court has found no seizures occurred where police walked through a factory and questioned workers about their citizenship, *see Delgado*, 466 U.S. 210; where agents approached a traveler in an airport, asked to see her airline ticket and driver's license, and asked questions about her identification and travel, *Mendenhall*, 446 U.S. 544; or where officers asked for a traveler's airline ticket and driver's license and physically held both, *Royer*, 460 U.S. 491. Like in *Royer*, *Mendenhall*, and *Bostick*, the officers asked Ward for his identification and asked general questions about what the men were doing by the market. Under Supreme Court precedent, this interaction amounted to a consensual police encounter but not a seizure.

Ward, however, contends that "[o]fficers can be heard on the video tape using a threatening tone," which elevated the encounter to a seizure. CA6 R. 14, Ward Br., at 10. Ward is correct that an officer's threatening tone can change a consensual interaction into a seizure. *See Mendenhall*, 446 U.S. at 554 (noting that there might be a seizure when "the use of language or tone of voice

8

indicat[es] that compliance with the officer's request might be compelled"). The video record of this encounter, however, does not suggest that the officers used a threatening tone of voice. Throughout the two-minute time period, the officers retain a noticeably, perhaps even surprisingly, non-threatening tone. Aside from the general idea that any citizen-police encounter may carry an inherent threat, there is nothing in the video record that indicates threat of punishment or violence if Ward did not engage in conversation with the officers. Therefore, the officers' asking Ward for his identification, asking general questions about what the men were doing, and Ward providing his Social Security number, did not alone constitute a seizure under the Fourth Amendment.

3.

*Pat-down of Hunter*. Thus, the crux of this case centers around whether there was a seizure in the remaining minute between when the officers procured identification and when Ward fled. During this time period, the officers conducted a pat-down of Hunter while Ward stood a few feet away, leaned against the SUV vehicle, and gave instructions to his dog to sit. Ward mostly looked at his dog and away from the officers. Following Hunter's pat-down, Sharp turned toward Ward and told him to "come on over here." Gov't Ex. 1, Video, at 13:38:45–13:38:47. Instead of complying, Ward fled. Under these circumstances, we conclude that Ward did not submit to the officers' show of authority and therefore no seizure occurred until he was later detained.

The police "may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission." Brendlin, 551 U.S. at 254. Passive acquiescence can be one form of that submission. *Id.* at 255. Otherwise, when there is no actual submission, "there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Id.* "[W]hat may amount to submission depends on what a person was doing before the show of

9

authority." *Id.* at 262. For example, a "fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Id.*

Whether Ward submitted to the officers' authority through passive acquiescence when he stood by as the officers frisked Hunter is a close call. *Brendlin* itself does not explain what it means to passively acquiesce. This court's decision in *United States v. Logan*, however, is instructive. In *Logan*, three patrol cars descended on a parking lot in which they found a vehicle with four to five occupants of whom they suspected of drug trafficking. *Logan*, 526 F. App'x 498, 499 (6th Cir. 2013). As the officers emerged from their cars, the defendant, Logan, exited the vehicle. *Id.* An officer drew his gun and ordered Logan back into the vehicle. Then Logan "kind of stutter stepped toward the passenger's seat where he originally was, and he kind of stutter stepped away from it, and went back and forth for a little bit." *Id.* at 501. The court found that until Logan stopped stutter-stepping in hesitation, he was "at most . . . contemplating submission, which falls short of actual submission." *Id.* at 502. Thus, stutter-stepping back and forth—rather than running from the scene—did not constitute the level of passive acquiescence needed to form submission.

Here, Ward's behavior is similar to Logan's. Although he remained on the scene and shuffled around while the officers frisked Hunter for about twenty-five seconds, this behavior is more consistent with contemplating submission than with actual submission, especially given that he ultimately ran. Had this behavior endured for an extended period of time or had Ward given some indication that he planned to remain on the scene for as long as the officers wanted, we may have been able to find submission in the form of passive acquiescence. But what amounts to submission "depends on what a person was doing before the show of authority." *Brendlin*,

10

551 U.S. at 262. And, here, Ward continued doing what he had been doing for hours before the officers arrived: he stood on the sidewalk, and he talked to his dog.

This case is also different from *Brendlin*, where the court found that a car passenger was seized when he remained seated after the car had been pulled over. While the Court said that someone sitting in a chair could acquiesce by continuing to remain seated, an inherently submissive act, Ward did nothing to indicate submission while the officers frisked Hunter: he shuffled around, talked to his dog, and continually refocused his attention from the officers to his dog to the bystander. Moreover, unlike a car passenger whose movement is impeded when a car is pulled over, Ward made no adjustments to what he had been doing all day when the officers frisked Hunter.

Moreover, when Sharp did eventually ask Ward to "come on over here," Ward explicitly disregarded the instructions and ran from the scene. Thus, while "one sitting . . . may submit to authority by not getting up to run away," *Brendlin*, 551 U.S. at 262, Ward ultimately did the exact opposite. He ran. Thus, there was no seizure under the Fourth Amendment. *See Robinson v. Howes*, 663 F.3d 819, 828 (6th Cir. 2011) (holding defendant was not seized when he ran from officers who approached his parked vehicle with guns drawn, and noting that defendant "was not yet seized when he saw officers approaching his vehicle with their guns drawn because he did not submit to their show of authority"); *Martin*, 399 F.3d at 752 (holding defendant was not seized when he disregarded officers' commands to stop and ran instead, and noting that "because a seizure does not occur when a mere show of authority occurs, but only when one yields to a show of authority, the [F]ourth [A]mendment does not apply to anything one may abandon while fleeing the police in an attempt to avoid a seizure").

11

Additionally, that the officers may have intended to pat down Ward does not change the encounter into a seizure. At the suppression hearing, Campbell testified that he "believe[d] Officer Sharp was going to pat [Ward] down." DE 21, Hearing Tr., Page ID 85. Campbell's belief is not relevant to the question of whether Ward submitted to the officers' authority when he watched Hunter's pat-down and then fled. Whatever the officers' intent, an attempted seizure is still not a seizure. *See Smith*, 594 F.3d at 538.

The district court therefore erred when it concluded that Ward was seized. It concluded that there was a seizure when the officers began patting down Hunter because a reasonable person in Ward's shoes would not have believed he was free to go. This may be true. But a seizure under the Fourth Amendment requires more than that when the police do not use any physical force. Instead, even if a reasonable person would not feel free to leave, a defendant is not seized unless there is actual submission to the officers' show of authority. *Id.* at 536. ("[T]here is no seizure without actual submission; . . . there is at most an attempted seizure.") In *Smith*, the court held that even if a reasonable person in the defendant's shoes would not have felt free to leave, there was no seizure because the defendant tried to push past the officers who surrounded him in a hallway. *Id.* at 539. Thus, although a reasonable person in Ward's shoes may not have felt free to leave, as the district court concluded, this was not enough to constitute a seizure. *Id.* Ward had to actually submit to the officers' show of authority. He did not. Ward watched the officers pat down Hunter, and then he ran. At no point did he indicate submission to the officers' authority. And, when specifically asked to comply, he did the opposite. Thus, we conclude that Ward did not submit to the officers' show of authority and there was no seizure under the Fourth Amendment.

4.

The Fourth Amendment protects against unreasonable seizures, not unreasonable attempted seizures. Thus, because there was only an attempted seizure, we decline to consider whether the officers had reasonable suspicion to suspect Ward of drug dealing.

III.

For the reasons stated, we affirm the district court's denial of Ward's motion to suppress the firearm on alternative grounds.