RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0032p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

REGINALD SMITH,

*Defendant-Appellant.*

No. 08-4378

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 07-00039-001—Michael R. Barrett, District Judge.

Argued: January 21, 2010

Decided and Filed: February 10, 2010

Before: SILER, ROGERS, and McKEAGUE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Bryan Robert Faller, PORTER, WRIGHT, MORRIS & ARTHUR, LLP, Columbus, Ohio, for Appellant. Karl P. Kadon, III, ASSISTANT UNITED STATES ATTORNEY, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Bryan Robert Faller, PORTER, WRIGHT, MORRIS & ARTHUR, LLP, Columbus, Ohio, W. Kelly Johnson, PORTER, WRIGHT, MORRIS & ARTHUR, LLP, Cincinnati, Ohio, for Appellant. Karl P. Kadon, III, ASSISTANT UNITED STATES ATTORNEY, Cincinnati, Ohio, for Appellee.

_____

**OPINION**

_____

McKEAGUE, Circuit Judge. Defendant-Appellant Reginald Smith unsuccessfully sought to suppress evidence of a handgun taken from him by Cincinnati police officers as he was leaving an apartment building in Over-the-Rhine, Cincinnati at approximately 3:00 a.m. on November 21, 2006. The officers encountered Smith in the entrance hallway of the apartment building while responding to a 911 emergency call. The record reflects that Smith was not seized until Officer Putnick told him to stop and, at that point, the officers had a

1

reasonable, articulable suspicion that he had been engaged in criminal activity. Therefore, the district court properly found that the officers' encounter with Smith did not violate the Fourth Amendment. We **AFFIRM** the district court's decision denying suppression and **AFFIRM** Smith's conviction.

## I. BACKGROUND

On November 21, 2006, at approximately 3:00 a.m., Cincinnati police officers were on uniform patrol in Over-the-Rhine, a high-crime, high-drug area just north of downtown Cincinnati, when they were directed to respond to a 911 emergency call at a four-to-five story apartment complex in that neighborhood. Officers Luke Putnick and Brendan Rock were on patrol together and arrived first. They waited for their backup (Officers Herman Hill and Eric Weyda) to arrive before attempting to enter the apartment complex. However, when they attempted to enter the apartment complex, the officers could not get into the building because the front door was locked. The front double doors of the building were made of glass, so the officers were able to see into the entrance hallway. The entrance hallway was approximately "6 feet by 6 feet or 7 feet by 7 feet" and led to another set of double doors which, apparently, were not locked and opened into a lobby. (R. 58 Weyda 17, 21.)

Over the next three to fifteen minutes, the officers sought some way into the building by ringing the door buzzers, knocking on windows, making noise (in particular, through the horn attached to their vehicle), using searchlights, and having dispatch try to contact the residence from which they had received the 911 call. Officer Putnick climbed the fire escape and knocked on the windows along the second floor. Finally, through the glass front doors, the officers observed Smith, coming towards them and carrying both a "bike . . . and a bag of food." (R. 58 Hill 36-37.) It appears that Smith opened the front door and let the officers in.

As Smith "unlocked and opened the door, there was kind of an altercation" because, as the officers were rushing in, Smith "was trying to rush out of the door." (R. 58 Weyda 22.) Primarily for safety reasons, the officers took up a "tactical position" around Smith as they moved past him inside the hallway. (R. 58 Hill 45.) Officer Hill was on Smith's left and Officers Putnick and Rock were on his right; but Officer Hill testified that Smith was not

surrounded because, "[t]he doorway was actually -- was free egress actually to the door. They were to his right, and I was to his left."  (R. 58 Hill 45; *but see* R. 30 Putnick 43 (noting that Officer Weyda was behind the officers).)  In any event, there certainly was a "kind of a congestion . . . just inside of the front door" because of the dimensions of the hallway and because Smith "did not step back and allow the officers to come through" but, instead, "was trying to push his way out as they were going in . . . ."  (R. 58 Weyda 22; *see also* R. 30 Putnick 17, 36 (noting that Smith "was basically forcing us out of the way in the door to try to leave the residence," "wasn't looking at us and kind of was keeping his head down trying to get out right away," and "forcing his way through" the officers with his mountain bike).)

As the officers entered the building, they began to ask Smith questions.  Officer Hill testified that Officer Rock "tried to engage in conversation with [Smith] to ask where he came from.  He was kind of evasive in his answers, really didn't look at Officer Rock and tried to keep on going outside. We asked him to slow down."  (R. 58 Hill 28.)  Officer Hill also testified as to the content of the questions that Officer Rock asked Smith: first, "what apartment did he come from"; and, second, Smith's "name."  (R. 58 Hill 43-44, 46 (Officer Hill testified that he thought Smith's responses were "vague."  He could not remember Smith's answer to the first question but believed that he provided his name in response to the second).)  Officer Hill also remembered that Officer Rock asked a third question but he could not remember what it was.  Officer Hill noted that,  "[d]uring the time that he was being questioned by Officer Rock," Smith was "[l]ooking away and still trying to roll his bike past. I mean, it was a tight spot. They were to his left. I was to his right. He was still trying to roll the bike."  (R. 58 Hill 46.)

Officer Weyda, who was standing outside the hallway, also observed some of the "exchange" and he "overheard small blurbs of Officer Rock asking Mr. Smith questions about what apartment were you coming from, what are you doing here."  (R. 58 Weyda 8.) Officer Weyda "observed [that] Mr. Smith was very, very agitated as if he was in a hurry. He was very, very unsettled." (R. 58 Weyda 8.)  Officer Weyda also remarked that he could only hear Officer Rock's questions, but not Smith's responses.

Officer Putnick testified that he also, "tried to make some conversation" in order "to see if I could get any reaction out of [Smith]." (R. 30, Putnick 18.) In particular, Officer Putnick asked, "'How you [sic] doing, sir? Do you live here?' And he really didn't acknowledge me. He just kind of kept his head down and tried to keep walking. At that point when he didn't acknowledge me, my suspicion raised a little bit and I asked him to stop." (R. 30 Putnick 18.) Officer Putnick further clarified that:

> Basically I explained to him that we were here for a radio run and that I wanted to know if he lived there, and as long as he wasn't involved in any of the activity upstairs, that he would be free to leave, that we first had to go up and check that out. But due to my -- due to him trying to force his way out and everything, I said, you know, "I'm just a little suspicious. I don't know if you're involved. As soon as we can determine that you're not, you'll be free to leave."

(R. 30 Putnick 19.) Once Officer Putnick told Smith "to stop" he testified that he did not believe that Smith was "free to leave" although the officers did not put Smith in handcuffs or draw their firearms at this time. (R. 30 Putnick 19, 40; *see also* R. 58 Hill 39, 43.)

Finally, after the questions, Officer Weyda, "just observed [Smith] as being very, very -- in a hurry. You could tell that he was flustered, and then he kind of -- he was making very (indicating) movements, furtive movements." (R. 58 Weyda 23.) Officer Putnick testified that Smith "wasn't really focused on what I was saying because he said, 'Well, I'll just -- I got an ID.' And at that point, he started to reach into his jacket." (R. 30 Putnick 19.) As Smith, "made a movement towards his coat," there "was a big rush where Officer Hill and Officer Rock grabbed him, both of his arms. During that time period, I did overhear them say, you know, 'Keep your hands out. What are you reaching for?' And then they grabbed him. It all happened very, very fast." (R. 58 Weyda 8, 23 (testifying that although he "didn't exactly see what happened" he did observe a "distinct motion" and "saw the defendant move very abruptly" which caused Officers Rock and Hill to "grab him from one side and the other. And then I saw Officer Putnick, who was directly in front of me, just going inside of the door, lunge at Mr. Smith, and immediately stepped back to me and hand me a firearm.").)[1] In all, it took "less than two minutes" from the time the officers "got

---

[1]Similarly, Officer Hill testified that:

> As Officer Rock was talking with him and Officer Putnick, [Smith] made a quick

in the building until the time Officer Putnick retrieve[d] the gun from [Smith's] waistband."  (R. 58 Hill 44.)

Smith was charged in federal district court with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 942(a)(2).  Smith moved to suppress evidence of the firearm.  The district court conducted two evidentiary hearings related to Smith's motion to suppress and  Smith's motion for reconsideration of the motion to suppress.  At the first evidentiary hearing, the district court heard the testimony of Officer Putnick; at the second, it heard the testimony of Officers Weyda and Hill.  After receiving Officer Putnick's testimony in the first evidentiary hearing, the district court denied Smith's motion to suppress.  After the second evidentiary hearing, the district court denied Smith's motion for reconsideration.

## II.  ANALYSIS

On appeal from the denial of a motion to suppress, this court reviews the district court's findings of fact for clear error and its conclusions of law de novo.  *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006).  "A factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *United States v. Nichols*, 512 F.3d 789, 793 (6th Cir. 2008) (citation omitted).  This court accords "deference to the district court's assessment of credibility inasmuch as the court was in the best position to make such a determination." *United States v. Garrido*, 467 F.3d 971, 977 (6th Cir. 2006) (citation omitted).  "The evidence

---

gesture all of a sudden . . . [t]owards the inner part of the jacket.  At that point, I just touched his left arm and told him to slow down. I believe Officer Rock or Putnick touched his right arm. Just in that movement, Officer Putnick, I think he might have seen a gun or something. He looks in there, reaches in, pulls out the handle of the gun and then hands it to Officer Weyda.

(R. 58 Hill 28.)  Officer Putnick testified that:

All he did, like I said, he just reached up right away with his hand. I mean, it wasn't like, "Hey, I have my ID" and then went in. It was, "I have my ID," and he was going into his jacket as he was saying it right away. And that's -- it's very alarming for an officer in that area for someone to immediately reach into their jacket where typically guns are kept.

(R.30 Putnick 45.)

must be considered in the light most favorable to the party that prevailed in the court below–in this case, the government." *Id.*

### A.  The Fourth Amendment

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *Terry v. Ohio*, 392 U.S. 1, 9 (1968)).  This court has stated that "there are three types of permissible encounters between the police and citizens" under the Fourth Amendment: "'(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause.'" *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2000) (quoting *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997)).  Here, the interaction between Smith and the Cincinnati police officers began as a consensual encounter but developed into an investigatory detention or *Terry* stop when Officer Putnick ordered Smith to stop.

### i.  Encounters that do not amount to a seizure

In order for a seizure to occur, the encounter must not be consensual and the officers must use physical force or the individual must submit to the officers' show of authority.  *Brendlin v. California*, 551 U.S. 249, 254 (2007); *California v. Hodari D.*, 499 U.S. 621, 628 (1991).[2]  "[A] consensual encounter becomes a seizure when 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).  We have noted that, "[c]ircumstances indicative of a seizure include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the

---

[2] Physical force creating a seizure needs more than mere physical contact but, rather, involves the intentional application of force. *Hodari D.*, 499 U.S. at 624-25.

person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *Id.* (quoting *Mendenhall*, 446 U.S. at 554).

However, absent the intentional application of physical force, even if there is a show of authority and a reasonable person would not feel free to leave, in order for a seizure to occur there must also be submission to the show of authority: "there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Brendlin*, 551 U.S. at 254 (citations omitted) (the Court noted that "[a] person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement . . . *through means intentionally applied*" (emphasis in original) (citations omitted)); *see also Hodari D.*, 499 U.S. at 626 n.2. Concerning submission, the Court noted that: "what may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Brendlin*, 551 U.S. at 262.

### ii. Investigatory **Terry** *stops*

In evaluating an investigatory *Terry* stop, this court engages "in a two-part analysis of the reasonableness of the stop." *Caruthers*, 458 F.3d at 464 (quoting *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005)). "We first ask whether there was a proper basis for the stop" and, if the stop was proper, "then we must determine whether the degree of intrusion . . . was reasonably related in scope to the situation at hand." *Id.* (quotations omitted).

An investigatory stop of an individual by a law enforcement officer is proper so long as there is a reasonable basis for the stop. *Terry*, 392 U.S. at 22-24. An officer can stop and briefly detain a person when the "officer has reasonable, articulable suspicion that [a] person *has been*, is, or is about to be engaged in criminal activity." *United States v. Atchley*, 474 F.3d 840, 847 (6th Cir. 2007) (quoting *United States v. Hensley*, 469 U.S.

221, 227 (1985)) (emphasis in original); *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."). However, to justify a *Terry* stop, an "inchoate and unparticularized suspicion or 'hunch'" is not sufficient. *Terry*, 392 U.S. at 27 (citation omitted). Instead, the officer must be "able to articulate some minimal level of objective justification for making the stop," *Waldon*, 206 F.3d at 604 (quotations omitted), based upon "specific reasonable inferences which he is entitled to draw from the facts in light of his experience," *United States v. Foster*, 376 F.3d 577, 585 (6th Cir. 2004) (quoting *Terry*, 392 U.S. at 27) (also noting that a "pattern of suspicious behavior need only be recognizable by one 'versed in the field of law enforcement'" (citations omitted)).

This determination is made in light of the totality of the circumstances. *Arvizu*, 534 U.S. at 273; *see also Sokolow*, 490 U.S. at 8 ("The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same–and so are law enforcement officers" (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981).). This process serves to balance the individual's interest in personal security with the government's interest in preventing ongoing or future criminal activity, solving past crimes, and bringing offenders to justice. *Hensley*, 469 U.S. at 228-29.

In the second part of the *Terry* stop analysis, this court determines whether the degree of intrusion, "was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Caruthers*, 458 F.3d at 464, 468 (quotations omitted) (noting that this court asks (1) whether the stop "was [] sufficiently limited in time, and (2) were the investigative means used the least intrusive means reasonably available"). The scope of the investigative stop depends on "the circumstances that originally justified the stop," *United States v Martin*, 289 F.3d 392, 396 (6th Cir. 2002),

and it is appropriate to consider whether the law enforcement officers, "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant," *Foster*, 376 F.3d at 585 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

### B. *Initial interactions not a violation of the Fourth Amendment*

Initially, Smith was not seized before Officer Putnick told him to stop. Although the entire encounter took under two minutes, *United States v. Drayton*, 536 U.S. 194 (2002), which is very analogous to this case, clearly supports a finding that the officers' initial interactions with Smith were consensual and, consequently, did not violate the Fourth Amendment. In *Drayton*, the Supreme Court considered when a reasonable person would consider an encounter with the police to be consensual. The Court considered a situation where three police officers dressed in plain clothes (but carrying weapons and visible badges) boarded a bus while the driver checked paperwork in the terminal. *Id.* at 197. One officer knelt in the driver's seat facing the rear of the bus, and the other two officers went to the rear. *Id.* One officer remained at the rear of the bus, while the other worked his way toward the front, speaking with individual passengers as he went. *Id.* at 198. When he got to respondents Drayton and Brown, who were sitting side by side, the officer approached them from the rear, leaned over Drayton's shoulder, briefly held up his badge, and "[w]ith his face 12-to-18 inches away from Drayton's . . . spoke in a voice just loud enough for respondents to hear." *Id.* He told them: "I'm Investigator Lang with the Tallahassee Police Department. We're conducting bus interdiction *[sic]*, attempting to deter drugs and illegal weapons being transported on the bus. Do you have any bags on the bus." *Id.* (citation omitted) (emphasis in original). He asked for, and received, consent to search a green bag above the respondents; but his search did not reveal any contraband. *Drayton*, 536 U.S. at 199. Then he asked for, and received, consent from Brown to search his person. *Id.* He reached across Drayton to search Brown, and found contraband on Brown. *Id.* After handcuffing Brown, and having another officer escort him off the bus, the officer asked for, and received, consent to search Drayton. *Id.* He found additional contraband on

Drayton.  *Id.*  The Court found that this encounter between the officers and both respondents was consensual.  *Id.* at 203-206, 208.

As *Drayton* shows, officers can ask questions without reasonable suspicion. *Drayton*, 536 U.S. at 197-99.  Furthermore, they can position themselves immediately beside and in front of a suspect and even reach across a suspect, provided they leave a way out.  *Id.* at 197-99, 201-02.  Thus, the fact that uniformed police officers here were asking Smith questions while surrounding him on both sides, in close physical proximity, with another officer at some distance in front of him, did not make the encounter non-consensual.  Indeed, the fact that three officers rushed into the building as Smith opened the door may have given Smith some cause for alarm.  However, it is more significant that the officers did not initially seek to arrest or stop Smith as they entered the building.  They did not block Smith in; instead, they merely tried to move around and past him.  This would have indicated to a reasonable person that the officers were not trying stop him and that, unless he engaged in activity that generated a reasonable, articulable suspicion, he was free to leave.  Certainly, the officers were not required to allow Smith out of the building before attempting to respond to an emergency 911 call; however, their need to enter the building quickly did not mean that a reasonable person would feel that he could not leave or that their initial encounter was non-consensual.

Furthermore, even if we assumed that a reasonable person would not feel free to leave, Smith still was not seized.  In *United States v. Jones*, we considered a situation in which a suspect did not immediately submit to the officers' show of authority.  562 F.3d at 774.  In *Jones*, police officers blocked a car in with their vehicles, after which Jones, a passenger, jumped out of the vehicle and started walking away from the officers.  *Id.* We noted that, despite that fact that "generally, when a police officer pulls over a vehicle during a traffic stop, the officer seizes everyone in the vehicle, not just the driver . . . there is no seizure without actual submission . . . [w]ithout actual submission, 'there is at most an attempted seizure.'"  *Id.* (quoting *Brendlin*, 551 U.S. at 254).  Jones did not "passively acquiesce," "remain seated," or "submit to the show of authority" but instead

"opened the car door and 'jumped out' as though he wanted to run." *Id.* The court held that, "[b]ecause Jones's initial response to the officers' arrival cannot be construed as submission to authority, there is no need to invoke the *Brendlin* reasonable person test to determine when the seizure occurred."[3] *Id.*; *see also United States v. McCauley*, 548 F.3d 440, 443-44 (6th Cir. 2008). Instead, Jones's failure to submit to the officers' show of authority meant that there was no seizure.

In this case, the officers did not use physical force to restrain Smith until they grabbed him when he reached into his jacket (after Officer Putnick told Smith to stop). Prior to that point, there is no evidence of any physical contact, and any physical contact would have been unintentional and a byproduct of the hallway's small parameters and the officers' efforts to enter quickly in response to the 911 emergency call (the officers did not physically block Smith in). Furthermore, even assuming that the officers made a show of authority when they surrounded Smith in the hallway in close physical proximity as they attempted to enter the building, Smith did not passively acquiesce or submit to their show of authority but, instead, tried throughout the encounter to push past the officers. Continuing efforts to push past the officers do not constitute submission to a show of authority. Consequently, there was no seizure at this point.

### C. Smith's activity when Officer Putnick told him to stop justified a Terry *stop*

Once Officer Putnick asked Smith to stop, a reasonable person would not have felt free to leave and the interaction turned into a *Terry* stop.[4] Officer Putnick told Smith that he was not free to leave at some point after the initial encounter but immediately before Smith reached for his ID.[5] At this point, as discussed above, the officers were

---

[3]As discussed above, the reasonable person test asks whether, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.

[4]Once he was told to stop, Smith stopped and thus submitted to the officers' show of authority. (R. 30 Putnick 47.)

[5]Officer Putnick told Smith, "as long as he wasn't involved in any of the activity upstairs, that he would be free to leave, that we first had to go up and check that out" and "I'm just a little suspicious. I don't know if you're involved. As soon as we can determine that you're not, you'll be free to leave." (R. 30 Putnick 19.)
Moreover, Officer Hill's comment that, "[w]e asked him to slow down" is either irrelevant or is

justified in making an investigatory *Terry* stop because the officers had a reasonable suspicion of criminal activity under the totality of the circumstances, which included: (1) the emergency 911 call; (2) Smith's efforts, with his head down, to push past the officers and exit the building as the officers entered; (3) that these events took place in a high-crime area in (4) the very early hours of the morning; and (5) Smith's vague responses to the officers' questions.

Smith contends that the 911 call is not a significant factor in considering the totality of the circumstances. Smith argues and the district court appears to have assumed that the emergency 911 call was a silent or hang-up 911 call.[6] In examining the 911 call, this court has found that a 911 hang-up call "standing alone without follow-up calls by a dispatcher or other information, is most analogous to an anonymous tip." *United States v. Cohen*, 481 F.3d 896, 899-900 (6th Cir. 2007) (noting that a silent 911 call may be made for numerous, non-criminal reasons and that "without any information from the caller, the silent 911 hang-up call was the equivalent of an anonymous 911 report that there might be an emergency, which might or might not include criminal activity, at or near the address from which the call was made"). *Cohen* noted that a "silent 911 hang-up call could be said to have suggested the possibility of, among other things, a limited 'assertion of illegality' but, absent any observed suspicious activity or other corroboration that criminal activity was afoot," even that limited assertion could not be accepted. *Id.* at 900 (citation omitted). The police officer who testified in that case stated that a person had called 911, but that the person had hung up "right after they dialed 911" without providing any additional information. *Id.* at 897 n.1. Thus, *Cohen* indicates that a silent 911 call can provide some support for a reasonable suspicion of

---

identical, for analytical purposes, to Officer Putnick's command. (R. 58 Hill 28.) Officer Hill's testimony may refer to Officer Putnick's statements instructing Smith to stop. However, even if it referred to a different comment, it was phrased as a request, which left Smith at liberty to continue on his way. Furthermore, even it this comment did trigger an investigatory stop it, like Officer Putnick's request, came after the police had received sufficient information to justify a *Terry* stop. Consequently, the same analysis applied to Office Putnick's order to stop would apply to Officer Hill's comment.

[6]Officers Putnick and Weyda did not remember what type of 911 call it was. However, Officer Hill offered testimony that the dispatcher reported that it sounded as if a struggle was going on inside the apartment.

criminal activity but, by itself, cannot support a finding that the law enforcement officers had a reasonable suspicion of criminal activity.

Therefore, even if we found that this was a silent 911 call, it offered a limited "assertion of illegality" which, in conjunction with other factors, could provide the officers with reasonable suspicion. However, in this case, Officer Hill testified that some additional information was communicated with the 911 call: "I recall the dispatcher saying it sounded like it was a struggle inside of the apartment building because the line was still open." (R. 58 Hill 31.) This information narrowed the inferences as to what caused the emergency 911 call, suggested criminal activity and, given the small number of apartments in the residential complex (*i.e.*, there were 12 buzzer buttons or 12 listings for names) and the time of night, significantly increased the probability that Smith might have been involved in criminal activity.

Furthermore, Smith's refusal to move out of the way of the officers and his efforts to push through them as they tried to enter the building and as they moved around him, also supported a finding of reasonable suspicion. The Supreme Court has found that flight from law enforcement officers in a high crime area can justify a reasonable suspicion of criminal activity. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Furthermore, this court has found that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Caruthers*, 458 F.3d at 466 (citing *Wardlow*, 528 U.S. at 124) (finding that Caruthers's action of "'hurr[ying]' away in a 'semi-running' manner" while not the same as "headlong flight" was still a relevant consideration in examining the reasonableness of an investigatory *Terry* stop). Moreover, "flight is not the only type of 'nervous, evasive behavior.' Furtive movements made in response to a police presence may also properly contribute to an officer's suspicions." *Id.* at 466-67 (noting that this factor must not be "invoked cavalierly" but finding that Caruthers's "unusual posture" of "'hunch[ing] down' near a wall, 'kind of leaning toward the ground'" supported a finding of reasonable suspicion).

Here, the officers described Smith throughout the encounter as very agitated and unsettled. More importantly, Smith did not merely run from the officers; instead, he

stood in their way, with his head down, and attempted to push through them and past them.  When they sought to enter the building, the police were not trying to investigate or intimidate Smith, they were not purposefully seeking to slow him down or to inhibit his movements; rather, they were seeking to respond as quickly as possible to a 911 emergency.  In response, Smith did not get out of their way, or simply stand still; instead, and without any explanation, he attempted, with his head down, to push his way through and past the officers.  Smith's aggressive behavior, which inhibited the officers' efforts to respond to a 911 emergency call, distinguishes this case from other *Terry* stop situations and contributes significantly to our finding that the officers had a reasonable suspicion of criminal activity.

Several other contextual considerations were also present, including that it was "late at night" and "a high-crime area."  *Caruthers*, 458 F.3d at 467-68.  Even though "these factors may not, without more, give rise to reasonable suspicion . . . they are relevant to the reasonable suspicion calculus."  *Id.* at 467 (numerous citations omitted) (the incident in *Caruthers* took place at 1:20 a.m.).  It was reasonable to conclude, based on Officer Putnick's prior testimony regarding his extensive experience in this area (and with this apartment complex, in particular) that this was a high-crime area.  Furthermore, 3:00 a.m., like 1:20 a.m. is, as *Caruthers* described it, "late at night."  While activity at such hours and in such an area, by itself, certainly could have an innocent explanation, in conjunction with the other factors, it supported a finding of reasonable suspicion.

Finally, Smith's evasive, non-responsive, and vague answers to the officers' questions, which (in part) prompted Officer Putnick's instruction to stop, also provided some additional basis for the officers' reasonable suspicion.  This court has noted that a suspect, "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, *without more*, furnish those grounds."  *United States v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007) (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983)) (emphasis added).  Thus, while a suspect's refusal to answer or listen does not, by itself, justify a

reasonable suspicion of criminal activity, it can be a factor that, together with other factors, supports a finding of reasonable suspicion.

Here, Officer Weyda could not remember any of Smith's responses to the questions he was asked. But Officer Hill testified that Smith, "was kind of evasive in his answers" and that he thought that Smith's responses were "vague." (R. 58 Hill 28, 43-44.) Officer Putnick testified that he asked Smith, "How you [sic] doing, sir? Do you live here?" and that Smith "didn't acknowledge me. He just kind of kept his head down and tried to keep walking. At that point when he didn't acknowledge me, my suspicion raised a little bit and I asked him to stop." (R. 30 Putnick 17-18.) Smith's refusal to answer some of the questions posed to him, and his vague and evasive answers to other questions, provided further support for the officers' reasonable suspicion that he was engaged in criminal activity.

The district court could properly conclude that (1) the emergency 911 call, (2) Smith's efforts to push past the officers with his head down, (3) the time of night, and (4) the fact that it was a high crime area, when analyzed together as required by the Supreme Court, gave the officers a reasonable, articulable suspicion that Smith had been engaged in criminal activity. The officers' reasonable suspicion was not merely based on an inchoate and unparticularized suspicion or hunch but, rather, on a common sense conclusion and specific reasonable inferences which the officers were entitled to draw from the facts in light of their experience. In short, when the only person present in the hallway of a residential complex keeps his head down and tries to push past officers while they are entering the complex in response to a 911 emergency call late at night, the district court may properly conclude that those officers have a reasonable suspicion that he has been engaged in criminal activity. Indeed, "[t]o have simply sent [Smith] on his way, without brief further questioning at the very least, would have been plainly unreasonable, even inept, police work." *Foster*, 376 F.3d at 587 (citation omitted).[7] Furthermore, (5) the fact that the dispatcher communicated that it sounded like a struggle

---

[7]We also note that all of these factors were present before the officers had initially positioned themselves around Smith.

was going during the 911 emergency and (6) Smith's evasive, non-responsive, and vague answers to the officers' questions further support our conclusion.

Moreover, the degree of intrusion was reasonably related in scope to the situation at hand.  Officer Putnick told Smith to stop until they could investigate what sort of emergency had necessitated the 911 call.  Presumably, had Smith not – immediately thereafter – reached into his jacket, and triggered a greater search, this would have only taken a few minutes, after which Smith, if there was no further cause for suspicion, would have been free to leave.  Consequently, in the brief time before Smith reached into his jacket, the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly and their actions did not violate the Fourth Amendment.

### D.  Once Smith reached for his ID, the officers were justified in grabbing him and, upon seeing the gun, seizing it

Almost immediately after the officers told Smith to stop, Smith suddenly reached into his jacket.  At this point, the officers were justified in grabbing him and the weapon they observed in his waistband.  An officer is permitted to conduct "a reasonable search for weapons for [his or her] protection . . . where he [or she] has reason to believe that he [or she] is dealing with an armed and dangerous individual."  *Terry*, 392 U.S. at 27 (1968).  In making this determination, "the officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  *Id.* Here, Smith's sudden reach into his jacket, in conjunction with the factors that justified the initial *Terry* stop and the fact that he was so close to the officers, gave the officers reason to believe that they were dealing with an armed and dangerous individual.  Indeed, a reasonably prudent person in the circumstances would be warranted in the belief that his safety or that of others was in danger.  Furthermore, as they moved to keep Smith from reaching into his jacket, Officer Putnick immediately saw a gun, which he seized.  The officers' response to Smith's sudden hand movement into his jacket did not violate the Fourth Amendment.

### III. CONCLUSION

The officers' initial contact with Smith, as they entered the building in an attempt to respond to the emergency 911 call, did not result in a seizure in violation of the Fourth Amendment. Furthermore, when Officer Putnick told Smith to stop, there was a proper basis for an investigatory *Terry* stop and the degree of intrusion was reasonably related in scope to the situation at hand. Consequently, since the officers' actions did not violate the Fourth Amendment, we **AFFIRM** the district court's decision denying Smith's motion to suppress and denying his motion for reconsideration and **AFFIRM** his conviction.