NOT RECOMMENDED FOR PUBLICATION
File Name:  14a0127n.06

**No. 13-1163**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Feb 13, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | **ON APPEAL FROM THE** |
| | ) | **UNITED STATES DISTRICT** |
| SHERROD DAVIS, | ) | **COURT FOR THE** |
| | ) | **EASTERN DISTRICT OF** |
| Defendant-Appellee. | ) | **MICHIGAN** |
| | ) | |
| | ) | |

BEFORE:  DAUGHTREY, GIBBONS, and DONALD, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.**   The Government appeals the district court's order granting Sherrod Davis's motion to suppress evidence of a firearm found on his person during a stop and frisk.  The Government argues that the officers had reasonable suspicion that Davis was engaged in criminal activity and therefore were within their authority to conduct the stop.  We affirm the district court's decision to suppress the evidence.

**I.**

Around midnight on October 16, 2011, Police Officers George Alam, John Gardner, and Timothy Simons were returning to a crime scene to pick up shell casings.  They were driving in a black, semi-marked[1] Crown Victoria police car—Alam driving, Gardner in the passenger seat,

---

[1] The car was outfitted with a large antenna and a push bumper, but it did not have the typical red bubble light on the top of the car nor a City of Detroit Police Department symbol on the side.

and Simons in the back behind Alam—on Livernois street. According to Alam and Simons, this was in a "high crime" area. Simons was thirsty and asked to stop at a gas station for water.

As they approached a well-lit gas station, Alam saw Sherrod Davis standing at the corner of the gas station. Davis was facing traffic with his back against the wall. Alam testified that he made eye contact with Davis when he drove by, roughly three car lengths away. According to Alam, Davis "looked like he was nervous, scared." Simons and Gardner also saw Davis standing against the wall, but did not testify about the particular expressions on Davis's face. After he made eye contact with Alam, Davis started walking toward the gas station's door. Alam then turned right into the gas station parking lot, pulling up as "close[] to the building as possible." Alam was parallel to Davis, slowly driving in the same direction as Davis was walking. "If [Alam had] opened the door, [he] would have hit Mr. Davis with it."

Alam saw that Davis's "[right] coat pocket [was] being weighed down by something in his coat pocket." As Alam got closer, he saw Davis put his right hand in his right pocket. Simons also saw Davis "check" his pocket and noticed that the pocket was swinging in a "pendulum effect." Gardner confirmed that "there appeared to be a large bulge in [Davis's] jacket right side pocket." His window already down, Alam asked Davis, "Sir, could you take your hands out of your pockets?" Davis took his hand out slowly, at which point Alam "could see the shape of the gun in his pocket." Specifically, Alam testified: "You could see it was a gun. The gun is the L-Shaped. Once you see a gun in somebody's pocket before, you can't mistake it. It is a perfect shape, and in his pocket, he got the cylinder in there, you can see it." Gardner agreed that "there was a bulge in the shape of a handgun in his coat." Davis then put his hand right back into his pocket. Davis never stopped walking during this exchange.

After Alam saw the L-shape of the gun, he said to his partners, "He's got it. He's got it." Alam put the car in park and Simons jumped out. Approaching Davis, Simons "said something to the effect of 'hey, my man, what is in your pocket?'" Davis responded, "Shit." Simons interpreted Davis's statement "as an indication that Mr. Davis had been caught with something." Simons then grabbed Davis's arms so he could not get into his pockets. Once Simons grabbed him, Davis stopped walking. While Simons held Davis, Alam reached into Davis's pocket and took out a revolver. Simons and Gardner then handcuffed Davis and arrested him.

Davis does not dispute the officers' general timeline. According to Davis, he walked to the store from his home to shop. He purchased several items at the gas station with a Bridge Card.[2] Davis testified that he stopped outside of the gas station because he was looking for his Bridge Card in his pockets. He was on his way back in to retrieve his card when the police stopped him and asked what was in his pocket. He explained that "Shit" meant "I don't have nothing [in my pocket]." Contrary to the officers' testimony that the gun was in Davis's outside right pocket, Davis testified that his gun was inside his sweatshirt, tucked down into his pants, underneath his jacket. Instead of a gun, Davis testified that he had a pop bottle in his outer pocket.

A grand jury indicted Davis for one count of Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1). Davis later filed a motion to suppress evidence of the firearm. From May 22–24, 2012, the district court held an evidentiary hearing. The district court then issued an order granting Davis's motion. The government timely appealed.

---

[2] Bridge Cards are food stamp debit cards used in Michigan's food assistance programs.

**II.**

When reviewing a motion to suppress, we review the district court's legal conclusions *de novo* and examine any factual findings for clear error. *United States v. Kinison*, 710 F.3d 678, 681 (6th Cir. 2013). "Factual findings or credibility determinations by the district court are clearly erroneous only if 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Simmons*, 174 F. App'x 913, 916 (6th Cir. 2006) (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985)). We view the evidence "in the light most likely to support the district court's decision." *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000) (quoting *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999)).

**III.**

"Encounters between police officers and citizens can be grouped into three categories: 'consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked some questions; a temporary involuntary detention or *Terry* stop which must be predicated upon reasonable suspicion; and arrests which must be based on probable cause.'" *United States v. Campbell*, 486 F.3d 949, 953–54 (6th Cir. 2007) (quoting *United States v. Bueno*, 21 F.3d 120, 123 (6th Cir. 1994)); *see also Terry v. Ohio*, 392 U.S. 1, 30 (1968). An encounter becomes a seizure for purposes of the Fourth Amendment only when, in view of all the circumstances, a reasonable person would have believed that he or she was not free to leave. *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010).

Initially, we note that both parties dispute the moment of seizure on appeal. The Government contends that Davis was seized when Simons grabbed his arms, while Davis contends that the relevant seizure occurred when Alam first pulled the police car alongside

Davis. The district court did not explicitly discuss the point of seizure in its opinion; however, it considered all the events leading up to the moment Davis was physically seized in its analysis. Here, we do not need to address the point of seizure because, even assuming that Davis was not detained until the officer grabbed his arms, we agree with the district court that the officers did not have reasonable suspicion to conduct the *Terry* stop.

"An officer can stop and briefly detain a person when the 'officer has reasonable, articulable suspicion that [a] person has been, is, or is about to be engaged in criminal activity.'" *Smith*, 594 F.3d at 536 (alterations in original) (emphasis omitted) (quoting *United States v. Atchley*, 474 F.3d 840, 847 (6th Cir. 2007)); *see also Terry*, 392 U.S. at 30 (holding that an officer must first reasonably conclude in light of his experience that criminal activity "may be afoot"). The officer must have more than a suspicion or "hunch." *Smith*, 594 F.3d at 536. Instead, the officer must be able to "'articulate some minimal level of objective justification for making the stop' based upon 'specific reasonable inferences which he is entitled to draw from the facts in light of his experience.'" *Id.* (internal citations omitted) (quoting *United States v. Waldon*, 206 F.3d 597, 604 (6th Cir. 2000); *United States v. Foster*, 376 F.3d 577, 585 (6th Cir. 2004)). Whether an officer had a reasonable suspicion supported by specific and articulable facts is determined under an objective reasonableness standard in light of the totality of the circumstances. *Id.*

The Government argues that the district court improperly isolated and rejected many of the facts of the stop rather than considering them within the totality of the circumstances. *See United States v. Arvizu*, 534 U.S. 266, 274 (2002). We find, however, that the district court did not perform an impermissible "divide-and-conquer analysis." *See id.* The district court explicitly articulated its application of "the totality of the circumstances" test, citing *United*

*States v. Mays*, 643 F.3d 537, 542 (6th Cir. 2011), and specifically referenced the *Mays* court's citation of *Arvizu*. The district court then considered eight factors in the totality of the circumstances. The stop occurred (1) shortly after midnight, (2) in a high crime area of Detroit. One or more officers testified that Davis (3) looked nervous when the officers pulled into the gas station and (4) began walking toward the gas station while (5) repeatedly touching something in his bulging pocket. (6) The officers recognized the weight and swing of the bulge as caused by a weapon's "pendulum effect." (7) After driving alongside Davis, the officers testified that they could see the bulge was in the unmistakable shape of a gun. (8) And when Simons stepped out of the car and asked Davis what was in his pocket, Davis said, "Shit" and reached for his pocket again. In evaluating these factors, the district court properly accorded some more weight than others. The district court interspersed its findings of fact among its weighing of the factors. A fair reading of the district court's opinion does not support the government's argument that the district court employed an incorrect analytical approach.

The district court's significant factual findings were based upon its assessment of the credibility of the witnesses at the suppression hearing. The district court found the officers' testimony "unconvincing," "speculative," and incredible. Specifically, the court found insufficient evidence to support the officers' testimony that the gas station was in a "high crime area." The district court also noted that while the stop occurred late at night, it took place in "a very well lit area." The district court further discredited Alam's testimony that Davis looked nervous and walked away from the officers. Likewise, the district court gave less weight to the officers' interpretation of Davis's exclamation, finding it "completely subjective and speculative." And although the district court afforded greater weight to the bulge in Davis's jacket, the court was not convinced the bulge appeared to be a gun. The court found that the

officers did not "dispute that Davis had been in the store that night and made purchases, which could have easily accounted for the bulge in [his] pocket."

We recognize that the district court was "in the best position to judge credibility," *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996), and therefore we "accord[] great deference to such credibility determinations," *Navarro-Camacho*, 186 F.3d at 705. After reviewing the record and hearing oral arguments, we are not left with a definite and firm conviction that the district court committed a mistake in these findings and thus hold that the district court's findings were not clearly erroneous.

In light of the district court's factual findings, we hold that the officers did not have reasonable suspicion to stop Davis. The officers pulled into a well-lit gas station around midnight and saw a man walking at a normal pace back toward the gas station door, which was same direction the officers were traveling. These facts, without more, are innocuous and do not indicate that a crime has or is going to take place. *See United States v. Beauchamp*, 659 F.3d 560, 570–71 (6th Cir. 2011) (holding that "hurriedly walking away from an officer," without more, does not rise to the level of independent suspicion). The Government argues that, when combined with the other facts, Davis's furtive hand movements in and out of his bulging pocket establish reasonable suspicion of unlawful activity. We disagree. The district court was not convinced that the bulge appeared to be a gun.[3] As the court recognized, Davis's conduct was ambiguous and subject to many different interpretations—for example, the bulge may have been a cell phone, wallet, or store purchases. We have held that "[a]n inquiry into reasonable

---

[3] Both parties presume that the officers had authority to conduct a *Terry* stop as long as they had reasonable suspicion that Davis was carrying a concealed weapon. In light of the district court's credibility findings regarding the officers' testimony, we do not need to decide whether carrying a concealed gun, in and of itself, constitutes "criminal activity" under Michigan law.

suspicion looks for the exact opposite of ambiguity: objective and particularized indicia of criminal activity." *Id.* at 571. Therefore, looking at the totality of the circumstances and deferring to the district court's findings of fact, we find that the officers did not have reasonable suspicion to stop Davis.

## IV.

For these reasons, we affirm the district court's order suppressing the evidence.