**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0019n.06

Nos. 15-3076/3078

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jan 12, 2016
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | ON APPEAL FROM THE UNITED |
| *Plaintiff-Appellee*, | ) ) | STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| v. | ) ) | |
| DWIGHT ERWIN HERRERA, | ) ) | |
| *Defendant-Appellant.* | ) ) | **OPINION** |
|  | ) | |

\*\*\*    \*\*\*    \*\*\*    \*\*\*

**Before: CLAY and ROGERS, Circuit Judges; THAPAR, District Judge.**[*]

THAPAR, District Judge. A jury convicted Dwight Herrera of two counts: conspiring to distribute cocaine and traveling in interstate commerce with the intent to conduct an unlawful activity. The district court sentenced him to a total of 240 months for these two crimes, then tacked on 30 more months for violating the terms of his supervised release. On appeal, Herrera makes four arguments as to why we should reverse his convictions. Specifically, he says that the district court should have granted his motion to suppress, allowed him to substitute counsel, excluded an alternate juror, and forbidden the prosecutor to ask witnesses whether they would face perjury charges for lying. He also makes one

---

[*]Hon. Amul R. Thapar, United States District Judge for the Eastern District of Kentucky, sitting by designation.

argument as to why we should vacate his sentence, namely that the district court should have allowed him to serve the extra 30 months concurrently. We affirm.

## I. Background

Beginning in 2012, Herrera was a member of a conspiracy that distributed drugs in the Cleveland area. R. 39 at 419 (superseding indictment). Law enforcement became aware of the Ohio-based part of the conspiracy while investigating an international drug-trafficking operation that smuggled drugs into California from Mexico, then distributed the drugs more broadly throughout the United States. R. 310 at 2236–40. Herrera and his co-conspirators participated in this larger scheme by smuggling drugs from California to Ohio inside secret compartments in their vehicles. *Id.* at 2243; R. 39 at 419. Once the drugs arrived in Ohio, the members of the conspiracy—including Herrera—were in charge of distributing the drugs locally. R. 310 at 2241–43.

On Herrera's final trip to Cleveland to distribute drugs, one of his co-conspirators picked him up in Michigan, and the pair traveled to the home of the co-conspirator's father. R. 311 at 2559, 2613–18. Surveilling officers watched Herrera arrive at the home and carry two bags inside. R. 26 at 175. A few hours later, the officers executed a search warrant, which allowed them to search for drug-related documents, on the home. *Id.* During the search, the officers opened one of the bags Herrera had removed from his car and found cocaine inside it. R. 91 at 708–12. Officers then stopped the search and returned with a revised warrant that permitted them to search the premises for drugs. *Id.* at 713–14. The officers arrested Herrera during this raid. R. 26 at 175.

Herrera challenged the search of his bags, arguing that the search exceeded the scope of the original warrant. The district court held that Herrera lacked standing to challenge the

search because he refused to acknowledge that the bags were his or that he was the person seen carrying them into the house. R. 91 at 757. The district court further held that the search of the bags was within the scope of the warrant issued by the magistrate judge. R. 91 at 758.

The government later charged Herrera with two crimes: conspiracy to possess and distribute at least five or more kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and § 846, and traveling in interstate commerce with the intent to conduct an unlawful activity—namely racketeering—in violation of 18 U.S.C. § 1952(a)(3). R. 39 at 419–449. After a trial, the jury convicted him on both counts. R. 314 at 3334–35 (trial transcript). The district court sentenced Herrera to 240 months for the conspiracy count and 60 months for the interstate-travel-in-aid-of-racketeering count, ordering him to serve these sentences concurrently. R. 254 at 1931–36 (judgment). The court also sentenced Herrera to 30 more months for violating the terms of his supervised release, to be served consecutively. R. 330 at 3740. This appeal followed.

## II.  Discussion

### A.      Motion to Suppress

Herrera first argues that the district court erred when it denied his motion to suppress the evidence the officers found during the raid of the house. We review "the district court's findings of fact for clear error and its conclusions of law de novo." *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010).

"It is well-established that Fourth Amendment rights . . . may not be vicariously asserted." *United States v. Williams*, 354 F.3d 497, 510–11 (6th Cir. 2003) (internal quotation marks omitted). Thus, to prevail on a motion to suppress, the defendant must show

3

that the search violated *his* rights rather than the rights of someone else. Even making the generous assumption that Herrera had standing, however, his motion-to-suppress argument fails because the search did not actually violate his Fourth Amendment rights. As the Supreme Court has held, "[a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *United States v. Ross*, 456 U.S. 798, 820–821 (1982). And as this Court has further explained, when a warrant has "authorized [] officers to look anywhere on [a particular] property for a small, easy-to-conceal item, it would be extremely difficult . . . to establish that the officers searched in places not authorized." *United States v. Garcia*, 496 F.3d 505, 508 (6th Cir. 2007).

Here, the police had a warrant to search the house for drug-related documents. That warrant permitted police to search anywhere that the drug-related documents might be. The bags could have easily contained such documents, and thus the warrant permitted the police to search them. Indeed, one of the bags was a backpack, the type of container in which people often store documents. And once the police opened the bag, the plain view doctrine allowed the police to seize the cocaine that they found inside. *See Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *see also United States v. Blakeney*, 942 F.2d 1001, 1027 (6th Cir. 1991) (holding that documents discovered during a search were admissible under the plain view doctrine even though the warrant made no reference to those documents). Thus, it seems that the warrant authorized the police to search the bags.

Herrera responds that the search was nevertheless invalid because the magistrate judge did not expressly contemplate a search of the bags when he signed the warrant. In

4

support of this argument, Herrera correctly points out that probable cause to search an area must exist both at the time the magistrate issues a warrant and at the time the warrant is executed. *United States v. Archibald*, 685 F.3d 553, 560 (6th Cir. 2012). Because the police knew the bags arrived in the residence only immediately prior to the search, Herrera argues, the police must have known that the bags were not covered by the magistrate judge's warrant. Thus, when they searched the bags anyway, he seems to argue, they exceeded the scope of the warrant.

This argument reads the scope of the warrant too narrowly: a warrant relates to the premises as the police find them—not as they were at the time the magistrate signed the document itself. The magistrate judge issued a warrant that allowed police to search the entire residence for drug-related documents. As explained above, such a warrant allows the police to search any container found within the residence that could reasonably contain such documents. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983) (stating that a magistrate judge must only ensure that there is "a fair probability that contraband or evidence of a crime will be found in a particular place"). That the bags were brought onto the premises after the warrant was issued is irrelevant. If the search warrant was for drugs, and drugs arrived immediately after the warrant was issued, no one would contest that police could search and seize the drugs. Documents are no different. Here, the police found the premises with the bags present, and thus they were permitted to search them. The defendant points to no authority that requires a residence to be frozen in time once a warrant is issued. Such a rule would be impossible to implement: the police who arrive at a scene usually have no knowledge of how long various items have been at the property or whether the items were on the property at the time the magistrate judge issued the warrant. Rather, it matters only that

the item is on the property at the time of the search and that it is covered by the scope of the warrant. And the bags here satisfied both of these conditions. Thus, the officers searched the bags pursuant to a valid search warrant, which means that they did not violate the Fourth Amendment when they did so. The district court properly denied Herrera's motion to suppress.

### B.     Motion to Substitute Counsel

Next, Herrera argues that the district court erred when it forbade him to substitute counsel. We review a district court's decision on an indigent defendant's motion to substitute counsel for abuse of discretion. *United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir. 2007). When determining whether a district court abused its discretion, the Court considers:

> (1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense, and (4) the balancing of these factors with the public's interest in the prompt and efficient administration of justice.

*United States v. Mack*, 258 F.3d 548, 556 (6th Cir. 2001).

Here, Herrera made three requests to substitute his counsel. The district court conducted a hearing on each of these requests. R. 306 (transcript from first hearing); R. 320 (transcript from second hearing); R. 328 (transcript from third hearing). At his first hearing, Herrera raised several complaints about his interactions with counsel, including: 1) that his counsel was not reading documents to him even though Herrera is legally blind, 2) that his counsel refused to file motions that Herrera requested because counsel believed they were

frivolous, and 3) that his counsel had an "attitude" when discussing the case with him. R. 306 at 2116–19. Herrera re-raised these issues in his second and third hearings.

Although the first *Mack* factor weighs in Herrera's favor because Herrera brought his first motion to substitute counsel well before the anticipated trial date, the remaining *Mack* factors all weigh against him. The second factor—the adequacy of the court's inquiry into the matter—weighs against Herrera because the district court held three separate hearings to address Herrera's request to substitute counsel. During these hearings, the district court inquired into all of Herrera's allegations. As the court continued this inquiry, it became clear that the real issue between Herrera and his counsel was that Herrera disagreed with his trial counsel's strategy in the case. Herrera acknowledged as much on several occasions. For example, in his first hearing Herrera stated that "I call [my counsel], he answered, but I'm asking him to do certain things in my case and he always tell[s] me 'I can't file this,' 'I can't file that.' I said 'You can file anything. If the Court is going to deny it, let them deny it.'" R. 306 at 2115. When the Court explained that "what motions to file or what to say in those motions" was a decision for counsel—not the client—the defendant further stated: "but when I try to talk to him he always get[s] an attitude. I never seen an attorney get an attitude like that when you trying to discuss something about the case." R. 306 at 2120.

In the second hearing, counsel explained that "I have answered his phone calls. I have gone out to see him several times. I have taken communications from his girlfriend, so I have tried to do my best to represent him," and said that his disagreements with Herrera would not affect his ability to represent him. R. 320 at 3557. At the third hearing, Herrera again said that his counsel was not reading documents to him, but counsel directly refuted this assertion. R. 328 at 3704-05. As the hearing progressed, it once again became clear that

the defendant's primary complaint involved differences in strategy and the defendant's misunderstanding of the law. *Id.* at 3714-15. Because the record shows that the district court engaged in multiple, in-depth discussions with Herrera about his conflicts with his counsel, and because Herrera had ample opportunity to explain these purported conflicts, the second *Mack* factor weighs against finding that the district court abused its discretion when it denied his motion to substitute. *See United States v. Vasquez*, 560 F.3d 461, 467 (6th Cir. 2009) (affirming district court's denial of a motion to substitute where the court engaged in "multiple lengthy discussions" and defendant had "ample opportunity to discuss in detail his complaints").

The third *Mack* factor—whether the conflict was so extensive that it caused a complete breakdown in communication or prevented an adequate defense—also weighs against finding that the district court abused its discretion. As explained above, although Herrera and his attorney disagreed about strategy, Herrera acknowledged that his counsel nevertheless continued to communicate with him. And Herrera's attorney explained that, despite the disagreements, he continued to represent Herrera vigorously. Thus, it appears that the conflict neither caused a complete breakdown nor prevented an adequate defense.

As for the fourth *Mack* factor—the public's interest in the prompt and efficient administration of justice—the record suggests that appointing new counsel would have undermined that interest. Most of Herrera's disagreements with his counsel stemmed from Herrera's misunderstanding of the law, a misunderstanding that likely would have persisted even if Herrera had a new lawyer. *See United States v. Marrero*, 651 F.3d 453, 467 (6th Cir. 2011) (explaining that a district court substituting counsel would impede the efficient administration of justice where most of the disagreements stemmed from a misunderstanding

of the law). Moreover, Herrera's last request to substitute counsel came only a few weeks before trial, and granting it would have resulted in a lengthy continuance to allow new counsel to learn about the case. In such circumstances, a substitution of counsel is rarely warranted. *See United States v. Whitfield*, 259 F. App'x 830, 834 (6th Cir. 2008) (explaining that "when the granting of the defendant's request would almost certainly necessitate a last-minute continuance, the trial judge's actions are entitled to extraordinary deference" (internal quotation marks omitted)). In sum, three out of the four *Mack* factors weigh against a finding that the district court abused its discretion. The district court's decision to deny Herrera's motion to substitute counsel was not reversible error.

### C.    Juror Impartiality

Herrera's third argument is that the district court should have excluded a juror that he says was biased. The Sixth Amendment guarantees a defendant the right to trial by a panel of impartial jurors. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). In most cases, we review a district court's decisions on juror impartiality for abuse of discretion. *United States v. Shackelford*, 777 F.2d 1141, 1145 (6th Cir. 1985). Here, however, Herrera never asked the court to exclude the juror, which means we review instead only for plain error. *See United States v. Herndon*, 156 F.3d 629, 634 (6th Cir. 1998).

After the opening statements at trial, Juror 27—an alternate juror—disclosed to the court that he had previously interacted with one of the case agents and that he had prior knowledge of the case from social interactions with officers. R. 310 at 2209–14. The juror also stated that he had seen one of Herrera's co-defendants at the casino where the juror worked. The juror had not told the court about these previous interactions during the voir dire. *See id.* at 2152–83. When the district court questioned the juror about these

disclosures, the juror indicated that nothing about his prior knowledge or interactions would affect his ability to be fair and impartial. *Id.* at 2210–14. Neither party objected to Juror 27 at trial, nor did Juror 27 participate in deliberations. R. 314 at 3319.

Herrera's argument that it was error for the district court to seat Juror 27 as an alternate is without merit. A juror need not be "totally ignorant of the facts and issues involved," and it is "sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Murphy v. Florida*, 421 U.S. 794, 800 (1975) (internal quotation marks omitted). Here, there is nothing to indicate that these brief interactions affected Juror 27's ability to serve as an impartial juror. When the court questioned the juror about previous encounters with officers, the juror stated that nothing about these occurrences would affect his ability to be impartial or to follow the court's instructions. R. 310 at 2209-12. He also said that the co-defendant's visits to the casino where the juror worked would have no impact on his ability to decide the case. *Id.* at 2214. The conclusion that Juror 27 was not partial is bolstered by the fact that neither the prosecution nor the defense was concerned enough about Juror 27's disclosures to object to his seating at trial. *See Skilling v. United States*, 561 U.S. 358, 396 (2010) (explaining that the defendant's failure to object to jurors at trial was "strong evidence" that the defendant did not believe the jurors were biased). Furthermore, Juror 27, as an alternate, did not participate in the jury's deliberations and accordingly had no impact on the verdict. *See United States v. Lawrence*, 735 F.3d 385, 442 (6th Cir. 2013); *see also Skilling*, 561 U.S. at 395 & n.31 (2010) (a defendant was not deprived of a constitutional right when no biased juror sat on the jury); *Ross v. Oklahoma*, 487 U.S. 81, 86 (1988) (noting that a claim that the jury was partial

must focus on the "jurors who ultimately sat"). Thus the district court committed no error, plain or otherwise, by seating Juror 27 as an alternate.

### D.       Prosecutorial Misconduct

Fourth, Herrera argues that the prosecutor questioned the government's witnesses in an impermissible way. Because the defense did not object to the government's questions during the examination, this Court reviews the district court's decision for plain error. *United States v. Garcia*, 758 F.3d 714, 723 (6th Cir. 2014). "The plain error doctrine mandates reversal only in exceptional circumstances and only where the error is so plain that the trial judge and prosecutor were derelict in countenancing it." *United States v. Slone*, 833 F.2d 595, 598 (6th Cir. 1987) (internal quotation marks omitted).

Herrera contends that the prosecutor committed misconduct when he asked government witnesses whether they faced perjury charges if they lied to the jury. As Herrera points out, the prosecutor asked Alfredo Martinez: "Do you know [that] I could probably prosecute you for perjury in a heartbeat?" R. 311 at 2552. The prosecutor asked Lawrence Donerson: "You don't think for a minute that I wouldn't hesitate to prosecute you, right?" and whether Donerson knew that he and the prosecutor were "not friends." R. 312 at 2698. And the prosecutor asked a third witness, Ronald McCloud: "Q: What are you going to do to keep yourself from getting prosecuted for perjury? A: Telling the truth. Q: I want you to look at these people right here. Are you telling them the truth today?" R. 313 at 2966. According to Herrera, these questions were such flagrant examples of prosecutorial misconduct that the district court should have stepped in to stop the questioning *sua sponte*. The court's failure to do so, Herrera argues, was plain error that warrants a reversal of his conviction.

11

The problem with that argument is a rather fundamental one: the prosecutor's questions were entirely proper. During cross-examination, Herrera's counsel implied that the cooperating witnesses were testifying for the government only to receive a favorable plea agreement. R. 311 at 2529 ("So, really, what has motivated you to come to Cleveland and say all these things about Mr. Herrera is the incredible deal that you got, right?"); R. 312 at 2660–61 (implying that the witness wanted a "favor from the Government"). Accordingly, the government was allowed to address this implication on redirect. *See United States v. Henry*, 545 F.3d 367, 379 (6th Cir. 2008) (explaining that "the government may attempt to explain why, based on the facts, that witness's testimony is honest after the same has been attacked by the defense" (citations omitted)). The district court did not err, therefore, by allowing the government to do just that.

Herrera responds that the prosecutor's questions amounted to "improper vouching," which occurs when the prosecutor "bluntly states a personal belief in a witness's credibility, 'thereby placing the prestige of the office of the United States Attorney behind that witness' . . . ." *Id.* at 378–79 (quoting *United States v. Francis*, 170 F.3d 546, 550–51 (6th Cir. 1999)). The prosecutor did no such thing here. There is no evidence that the prosecutor expressed his personal belief that the witnesses were telling the truth. Instead, he merely elicited testimony to show that the witnesses knew the consequences of lying and that the prosecutor would pursue these consequences if they were untruthful. Such testimony does not place the prestige of the office of the United States Attorney behind a witness. In sum, the district court did not commit plain error by allowing the government to ask these questions.

12

E.        **Consecutive Sentence**

Herrera's final argument is that the district court erred when it sentenced him to consecutive terms of imprisonment.  Specifically, Herrera argues that it was procedural error for the district court to require him to serve his sentences for the underlying offenses and his sentence for the previous supervised-release violation consecutively.  Since Herrera did not object to the consecutive nature of the sentence when given the opportunity, the Court reviews his sentence for plain error.  *United States v. Morgan*, 687 F.3d 688, 694 (6th Cir. 2012).

A district court may sentence a defendant to serve an undischarged sentence of imprisonment consecutively, provided that the district court considers "the factors listed in 18 U.S.C. § 3553(a), including any applicable Guidelines or policy statements issued by the Sentencing Commission."  *United States v. Johnson*, 640 F.3d 195, 208 (6th Cir. 2011) (citing 18 U.S.C. § 3584(b)).  A district court commits no abuse of discretion when it "makes generally clear the rationale under which it has imposed the consecutive sentence and seeks to ensure an appropriate incremental penalty for the instant offense."  *United States v. Owens*, 159 F.3d 221, 230 (6th Cir. 1998).

Here, the district court did just that.  At sentencing, the court explained that its rationale for the consecutive sentence was Herrera's involvement in a drug conspiracy so shortly after his release from prison: "You were released from prison on . . . November 30th of 2011, and this conspiracy for which you were convicted in the Northern District of Ohio started in 2012.  So less than a year after you were released from serving like 10 or 11 years in prison, you started up doing the same thing.  And I have to impose some penalty for that."  R. 330 at 3740 (sentencing transcript).  The district court also considered the 3553(a) factors,

13

as it was required to do. *Id.* at 3739. Ultimately, the district court varied downward from the recommended guidelines range for the supervised release violation, explaining that since the defendant was facing a "20-year sentence for the convictions in this case . . . [the court would] impose a sentence of 30 months for the supervised release on top of the 240. So that will be a total of 270 months." *Id.* Because the district court satisfied the requirements to impose a consecutive sentence, it did not commit plain error.[1]

## III.    Conclusion

Because Herrera has failed to show any reason that his convictions should be vacated or that his case should be remanded for resentencing, we affirm.

---

[1] Herrera relies on *United States v. Cochrane*, 702 F.3d 334 (6th Cir. 2012), to support his argument that the district court did not adequately explain its reason for imposing a consecutive sentence. But *Cochrane* is distinguishable from this case for several reasons. Most importantly, the district court in *Cochrane* did not provide a rationale for imposing a consecutive sentence. *See Cochrane*, 702 F.3d at 346. The district court here did.